The PEOPLE of the State of Colorado, Petitioner–Appellant,

In the Interest of R.A., a juvenile, and concerning M.A., Respondents–Appellees.

No. 96SA453.

Supreme Court of Colorado, En Banc.

April 21, 1997.

Jeanne M. Smith, District Attorney, Fourth Judicial District, Gordon R. Denison, Deputy District Attorney, Bryan L. Hunt, Deputy District Attorney, Colorado Springs, for Petitioner–Appellant.

Dianna L. Harris, Colorado Springs, for Respondents–Appellees.

Justice MARTINEZ delivered the Opinion of the Court.

In this interlocutory appeal, the prosecution seeks review of an order by the District Court of El Paso County affirming a juvenile magistrate's order suppressing statements and evidence found in the home of R.A., a juvenile. The magistrate, relying on section 19–2–210(1), 8B C.R.S. (1996 Supp.),[1] ordered the suppression of all evidence obtained in R.A.'s home because R.A.'s mother was not present. The prosecution petitioned for review of the magistrate's order pursuant to section 19–1–108(5), 8B C.R.S. (1996 Supp.),

and the juvenile court affirmed.[2] We determine that the magistrate made erroneous and incomplete findings of fact which preclude resolution of the issues raised. Because these errors were not corrected by the juvenile court, we reverse.

## I.

On February 15, 1996, Officer Wilkinson of the Colorado Springs Police investigated damage inflicted on a truck and a minivan at a high school parking lot. The damage included red spray paint, flattened tires, sugar in a gas tank and transmission fluid in speakers and air vents. A witness saw someone near the vehicles and provided a name from a photograph in the high school yearbook. The witness said that the suspect was wearing the school's letter jacket and carrying a black backpack. Wilkinson, who was in uniform, then proceeded in a marked patrol vehicle to the address of the individual named as a suspect. Wilkinson knocked on the door and R.A., a fourteen year old juvenile, answered.

Wilkinson testified that he told R.A. he was looking for an individual wearing the school's letter jacket. R.A. responded that the person was his brother, who was not in town. "[I] [a]dvised [R.A.] that I was looking for, there was a name on the, it was a . . . letter jacket the suspect was wearing and I advised him that I was looking for this individual which he told me was his brother and his brother was not in town." Wilkinson testified that he then requested permission to enter the home and R.A. gave that permission. "I asked him if I could come in and talk to him about this. He said, yes."

R.A. testified that Wilkinson entered his home without receiving permission. "He came to my door. Asked, he asked if he

---

**1.** Article 2 of the Children's Code was amended in 1996, effective January 1, 1997, resulting in the relocation of statutory provisions. The version of article 2 in effect prior to January 1, 1997, as well as the version effective January 1, 1997, are located in the 1996 supplement to volume 8B of the Colorado Revised Statutes. Because they were in effect at the time of the juvenile magistrate's ruling, this opinion cites relevant statutory provisions of article 2 in effect prior to January 1, 1997. These provisions, al-

though renumbered, were not substantively altered by the 1996 amendment.

**2.** In this case, "juvenile court" refers to the juvenile division of the District Court of El Paso County. *See* § 19–1–103, 8B C.R.S. (1996 Supp.) (" 'Juvenile court' . . . means the juvenile court of the city and county of Denver or the juvenile division of the district court outside of the city and county of Denver.").

could talk to me. I said, yes, seeing that he opened the door and walked in my house." According to R.A., Wilkinson asked if they had a letter jacket and then walked upstairs and began searching. "He asked if—if we had a letter jacket.... I told him that I would go look for it. As I was looking for it, he walked upstairs in my house. He picked up a black backpack on the floor. He looked through it and he went in the kitchen and got brown sugar off the refrigerator." R.A. also specifically denied ever giving permission for Wilkinson to enter the home, go upstairs, search the home or search the backpack.

Wilkinson's account is that after R.A. gave him permission to enter the home, they both went upstairs where Wilkinson asked R.A. if his mother or father was at home. R.A. responded that his mother was at work. Wilkinson told R.A. what happened, why he was there, and who he was. "I asked him if I could come in and talk to him about this. He said, yes. We went upstairs. It's a bi-level home to the main level. I asked him if his mother or father were home and he said, no, his mom was at work. And I, at that time, proceeded to tell him exactly what had occurred at the school, why I was there and what I was, who I was looking for."

The magistrate found that Wilkinson asked permission to enter the house to talk, learned that the owner of the jacket was not home and that R.A.'s mother was not home, and then went upstairs:

> When [Wilkinson] determined that the owner of the jacket was not home and that mother was not home, his right to the entry of the house ended. After that, however, he chose to apparently go up the stairs, look about the house.

According to the magistrate, Wilkinson learned that R.A.'s mother was not home while still downstairs. This finding is crucial to the magistrate's analysis of the case because he then concludes that Wilkinson's "right" to enter the home ended before Wilkinson went upstairs.

Wilkinson testified that after he questioned R.A. about the letter jacket, R.A. went into the bedroom and retrieved a letter jacket. Wilkinson observed a red substance that resembled spray paint on the jacket. Wilkinson also said he noticed a black backpack lying on the floor and observed the plastic cap of a transmission fluid bottle lying on top of the backpack. Wilkinson said he observed a knife sheath inside the pack's opening after he picked the pack up and placed it on the dining room table. R.A. said Wilkinson was following him around the house and looking around. The magistrate found that "these things were in plain view but the question is was he legally where he was supposed to be to have the plain view?" The magistrate concluded that:

> Consent to enter was given but not to search. The officer himself testified he did not obtain consent from anybody including the juvenile to search.... The officer should have either left the residence and waited outside for the mother to return or simply waited inside the doorway for the mother to return if the weather was inclement.

Wilkinson testified that he advised R.A. that he could not ask R.A. questions without R.A.'s mother present, and that he asked R.A. to call his mother at work and ask her to come home.[3] Wilkinson also testified that he asked R.A. if he was the owner of the backpack and requested that R.A. turn his hands up for inspection, all before R.A.'s mother arrived at the house some forty-five minutes later. When R.A. displayed his hands, Wilkinson observed what appeared to be red spray paint on them.

At some point after R.A. and Wilkinson went upstairs, a neighbor, Fred Martinez, came over to the house. Martinez testified that he was present when Wilkinson asked to see R.A.'s hands, and that the officer showed him the backpack, letter jacket and red cap. Martinez also testified that he observed Wilkinson in both the living room and kitchen of the home. When asked about R.A.'s demeanor, Martinez stated that "[h]e was crying. He was very upset and that's why I decided to stay."

---

3. Wilkinson testified that at no time prior to the arrival of R.A.'s mother did he read R.A. his *Miranda* rights. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). R.A. was advised only after R.A.'s mother arrived.

The magistrate found that R.A. was upset, but he did not address the manner in which items were discovered and seized other than to state that "these things" were in plain view, and that Wilkinson should not have been upstairs at all because he learned that R.A.'s mother was not at home while still downstairs. The magistrate concluded, relying on section 19–2–210(1), 8B C.R.S. (1996 Supp.), that "once the officer determined that the mother was not present, he should have stopped any investigation at that time and waited for her to arrive." The magistrate granted R.A.'s motion in its entirety.

Pursuant to section 19–1–108(5), 8B C.R.S. (1996 Supp.), the prosecution timely petitioned the juvenile court to review the magistrate's ruling.[4] Without explanation, the juvenile court affirmed. The prosecution then filed this interlocutory appeal. *See* C.A.R. 4.1(a).

## II.

██ Our review of the record in this case indicates that the findings of the juvenile magistrate are insufficient for appellate review. Moreover, a critical factual finding made by the magistrate is clearly erroneous. Because the juvenile court failed to alter this finding and failed to conduct further proceedings to resolve the legal issues in this

case, we reverse and remand the case to the juvenile court. *See People v. H.J.*, 931 P.2d 1177, 1183 (Colo.1997) (where trial court fails to make appropriate factual findings, our appellate function is hindered); *People in Interest of A.R.M.*, 832 P.2d 1093, 1095 (Colo. App.1992) (remanding juvenile case because "the lack of findings by the commissioner . . . did not provide a sufficient record to support [the district court's] affirmation of the commissioner's order.") We also direct the juvenile court to remand the case to the magistrate or another magistrate for further proceedings, or to conduct its own proceedings to correct the magistrate's errors and make sufficient factual findings to resolve the legal issues presented in this case.[5]

## A.

██ The record does not support the magistrate's findings that Wilkinson learned R.A.'s mother was not home when Wilkinson was downstairs and that Wilkinson subsequently went upstairs to the living room. The juvenile court failed to correct this crucial and clearly erroneous finding. The magistrate concluded that, once Wilkinson proceeded upstairs after entering the juvenile's residence, his presence was unlawful because his purpose for entering the home had already been satisfied. Contrary to this find-

---

4. Section 19–1–108(5), 8B C.R.S. (1996 Supp.) of the Children's Code provides that:

> A request for review shall be filed within fifteen days after the parties have received notice of the magistrate's ruling and shall clearly set forth the grounds relied upon. Such review shall be solely upon the record of the hearing before the magistrate and shall be reviewable upon the grounds set forth in rule 59 of the Colorado rules of civil procedure. A petition for review shall be a prerequisite before an appeal may be filed with the Colorado court of appeals or Colorado supreme court. The judge may, on his own motion, remand a case to another magistrate after action is taken on petition for review.

5. The procedural powers of a juvenile court after reviewing a juvenile magistrate's rulings are governed not only by relevant provisions of the Children's Code but also by the Colorado Rules for Magistrates. *See* C.R.M. 2. Provisions of these rules apply to proceedings involving juvenile magistrates unless statutory authority or another rule expressly precludes such application. *See*

*Estate of Jordan v. Estate of Jordan*, 899 P.2d 350, 351–52 (Colo.App.1995). Under C.R.M. 6, a district court judge may "adopt, reject or modify the initial order or judgment of [a] magistrate by written order, which order shall be the order or judgment of the district court." C.R.M. 6(e)(4). In addition, a reviewing judge may alter a magistrate's findings of fact if they are clearly erroneous, and, after reviewing the record and any motions and briefs filed, "conduct further proceedings, take additional evidence or order a trial de novo in the district court." *Id.* Although a separate rule exists for juvenile court magistrates, *see* C.R.M. 8, that rule does not address or define the powers of a juvenile court after it has reviewed the record on a petition for review pursuant to section 19–1–108(5). Consequently, the procedural options set forth in C.R.M. 6(e)(4) are available to the juvenile court to correct magistrate error. *See Estate of Gelberg*, 907 P.2d 724, 724 (Colo.App.1995) (although C.R.M. 9 specifically concerns Denver Probate Court Magistrates and does not provide that orders of those magistrates are subject to review pursuant to C.R.M. 6, the plain meaning of C.R.M. 2 compels application of C.R.M. 6).

ing, Wilkinson's testimony was that he learned R.A.'s mother was not at home only after he had entered the upstairs area of the house, and R.A.'s testimony was that Wilkinson walked into the home without permission, proceeding upstairs after asking only for the letter jacket. The magistrate's conclusion that Wilkinson's presence upstairs was invalid because Wilkinson knew the mother was not home—critical to his determination that evidence subsequently seized was inadmissible—was thus based on a clearly erroneous finding of fact. The magistrate apparently combined the very different versions of the facts told by Wilkinson and R.A. to create a third version which is without support in the record. Although the magistrate may believe all or part of the testimony of any witness, the magistrate may not create a version which is not supported by the testimony of any witness.

■ This clearly erroneous finding of fact was critical to the magistrate's analysis of the case because the magistrate determined that Wilkinson's "right" to enter the home ended at the moment he learned of the absence of R.A.'s mother and thereby accomplished his purpose for entering the home. Based on this finding, the magistrate concluded that Wilkinson's entry of the upstairs area of the residence exceeded the scope of R.A.'s consent. Because it was clearly erroneous, the juvenile court erred by failing to alter this finding of fact upon completion of its review of the record. *See* C.R.M. 6(e)(4) ("Findings of fact made by the magistrate may not be altered unless clearly erroneous.").

### B.

■ The magistrate erred by relying on section 19–2–210(1) without making findings to determine whether R.A. was in custody and whether R.A. was interrogated. Be-

cause sufficient factual findings were not made in light of the conflicting testimony on these issues, we cannot resolve them on appellate review. *See People v. MacCallum*, 925 P.2d 758, 766 (Colo.1996) (reviewing court must defer to trial court's findings of fact regarding custodial interrogation unless findings are not adequately supported by record or incorrect legal standard is applied).

■ The juvenile court must determine if any of R.A.'s statements or admissions were made in a custodial setting. A juvenile is in custody for purposes of section 19–2–210(1) if "a reasonable person in the [juvenile's] position would consider oneself deprived of his or her freedom of action in any significant way." *People in Interest of J.C.*, 844 P.2d 1185, 1189 (Colo.1993). Age is a factor to consider in determining if a juvenile is in custody, but custody does not necessarily exist simply because a juvenile is afraid and ignorant of his or her "ability to cease the questioning and leave." *Id.* at 1190.

■ The juvenile court must also determine if any of R.A.'s statements or admissions, including his consent to search,[6] were made while he was being interrogated by Wilkinson. Police interrogation "refers both to express questioning by a police officer, and to any words or actions on the part of the officer that he or she should know are reasonably likely to elicit an incriminating response from the defendant." *People v. Mack*, 895 P.2d 530, 535 (Colo.1995).

### C.

■ The magistrate did not make sufficient findings to determine if R.A.'s consent to enter and other statements, production of the letter jacket, and his display of hands, were voluntary. Although the magistrate found that R.A. was upset, this finding provides an insufficient factual basis for us to

---

**6.** A mere request for consent to search from a juvenile in custody may not always constitute interrogation and thus trigger the statute's requirement that a parent be present. *See People in Interest of D.F.L.*, 931 P.2d 448, 455 (Colo. 1997). We have recognized, however, that the statute does apply to a juvenile's consent to search when such consent is given in a custodial setting and in the context of questioning that

qualifies as interrogation. *See People in Interest of S.J.*, 778 P.2d 1384, 1387 (Colo.1989); *People v. Reyes*, 174 Colo. 377, 381–82, 483 P.2d 1342, 1344 (1971). A consent to enter a residence, like a consent to search, implicates the same concerns. *See People v. Milton*, 826 P.2d 1282, 1285–87 (Colo.1992) (applying voluntariness standard to consent to enter given by adult).

determine if the suppressed evidence was voluntarily provided. *See* § 19–2–208, 8B C.R.S. (1996 Supp.) ("In determining the voluntariness of a juvenile's consent to a search or seizure, the court shall consider the totality of the circumstances."); *People v. Licea,* 918 P.2d 1109, 1112 (Colo.1996).

▩▩▩▩ In a noncustodial setting, the voluntariness of R.A.'s consent and production of inculpatory evidence is determined by the same standard of voluntariness applicable to an adult. *See S.J.,* 778 P.2d at 1388. The juvenile court therefore must consider, under the totality of the circumstances, whether R.A.'s consent and production of evidence was "the product of an essentially free and unconstrained choice," *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), or whether it was the product of a will overborne by police coercion. *See Licea,* 918 P.2d at 1112–13. As with the custody determination, the court may consider R.A.'s age and the absence of his parent as factors in the weighing process, but should not accord them any greater weight than any other factor. *See J.C.,* 844 P.2d at 1190; *S.J.,* 778 P.2d at 1388. Other factors the court may consider include R.A.'s education, intelligence, and state of mind,[7] Wilkinson's demeanor and tone of voice, as well as the duration, location, and other circumstances surrounding the consent. *See Licea,* 918 P.2d at 1113; *Mack,* 895 P.2d at 536.[8]

### D.

▩▩▩▩ The juvenile court also must make additional findings to determine if Wilkinson's entry into the upstairs area of the residence exceeded the scope of R.A.'s consent.[9] The legal standard for making such a determination is one of "'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *People v. Olivas,* 859 P.2d 211, 214 (Colo.1993) (quoting *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991)). If the juvenile court finds that R.A. only consented to entry of the residence for inquiry purposes, his consent "contemplate[d] a much *lesser* degree of intrusion" than a consent to search, and did not "justify otherwise impermissible searches or seizures." *Milton,* 826 P.2d at 1285. If the juvenile court finds that Wilkinson expressed a purpose for requesting permission to enter, the court may consider that purpose in determining the scope of R.A.'s consent. *See Olivas,* 859 P.2d at 214 ("The scope of a warrantless search is generally defined by its expressed object, and a consensual search may not legally exceed the scope of the consent supporting it.") (citation omitted); 3 Wayne R. LaFave, *Search and Seizure* § 8.1(c), at 165 (2d ed. 1987) ("[C]onsent should be construed as authorizing only that intensity of police activity necessary to accomplish the stated purpose.")

### E.

▩▩▩▩ Once validly inside a residence, a police officer may lawfully seize evidence, without consent to a search, if the seizure comports with the plain view doctrine. *See Milton,* 826 P.2d at 1285. If the juvenile court determines that Wilkinson was lawfully present upstairs, the court must then decide whether any seizures satisfied the other elements of the plain view doctrine. Under that

---

7. We note that Martinez' testimony indicates that Officer Wilkinson was at times "curt" with R.A. and that, when Martinez arrived at the house R.A. was "very upset" and was crying. If the trial court finds this testimony credible, these facts are relevant to the voluntariness determination.

8. If the juvenile court determines that, at some point, R.A. was in custody, not all subsequent statements or admissions must necessarily be suppressed. If such statements or admissions were unsolicited and voluntarily made, then section 19–2–210(1) does not apply to them because they were not the result of interrogation. *See*

*People v. Haurey,* 859 P.2d 889, 894 (Colo.1993). Such voluntary statements or admissions would thus be admissible despite the absence of R.A.'s mother.

9. Of course, if the juvenile court finds that R.A.'s consent was invalid because it was involuntary or in violation of section 19–2–210(1), it need not decide the scope of such invalid consent. However, adequate findings of fact concerning issues which are not determinative may facilitate appellate review and make remand for more factual findings unnecessary when a reviewing court reaches different conclusions.

doctrine, Wilkinson's warrantless seizure of evidence was constitutionally permissible if (1) the intrusion upstairs was valid; (2) the discovery of the evidence was inadvertent; and (3) Wilkinson reasonably believed that the evidence seized was incriminating. *See People v. O'Hearn,* 931 P.2d 1168, 1173 n. 5 (Colo.1997); *see also Arizona v. Hicks,* 480 U.S. 321, 326–28, 107 S.Ct. 1149, 1153–54, 94 L.Ed.2d 347 (1987) (search or seizure of object in plain view constitutionally permissible if police have probable cause to believe object is incriminating). *But see Horton v. California,* 496 U.S. 128, 130, 110 S.Ct. 2301, 2304, 110 L.Ed.2d 112 (1990) ("[E]ven though inadvertence is a characteristic of most legitimate 'plain-view' seizures, it is not a necessary condition.") Thus, if the juvenile court finds on remand that Wilkinson was lawfully upstairs, the court must determine if each item discovered was actually in plain view—and not the result of a search—and if the seizure of each item was justified by probable cause "to associate the property with criminal activity." *People v. Melgosa,* 753 P.2d 221, 226 (Colo.1988).

### III.

We reverse the order of the juvenile court affirming the magistrate's suppression order and remand this case to the juvenile court with directions to review the order of the magistrate. On remand, the juvenile court may utilize procedures to correct the magistrate's erroneous and insufficient findings which were initially available. We provide the following directions.

■ A juvenile court's consideration of a petition for review commences with a determination of whether grounds set forth in C.R.C.P. 59 are alleged. If so, the juvenile court shall review the magistrate's order solely upon the record. The magistrate's findings of fact shall not be disturbed if they are supported by the record.

■ Here, the findings are erroneous and the juvenile court shall reject the order. The juvenile court may then remand the case to the magistrate, or to a different magistrate, for further evidence and different or additional factual findings. In the alternative,

the juvenile court may itself take additional testimony or conduct a de novo hearing. The juvenile court is cautioned not to make determinations of credibility from the cold record and to select the manner in which it will proceed consistent with the most efficient resolution of the dispute presented. Finally, the juvenile court shall make any necessary corrections to assure the correct application of law to the findings, consistent with this opinion.