The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Albert Raymond GONZALES,
Defendant–Appellee.

No. 99SA197.

Supreme Court of Colorado,
En Banc.

Nov. 1, 1999.

Stuart A. VanMeveren, District Attorney, Eighth Judicial District, Loren B. Schall, Assistant District Attorney, Fort Collins, Colorado Attorneys for Plaintiff–Appellant.

David F. Vela, Colorado State Public Defender, M. Janet Laughon, Deputy State Public Defender, Kathryn Hay, Deputy State Public Defender, Denver, Colorado, Attorneys for Defendant–Appellee.

Chief Justice MULLARKEY delivered the Opinion of the Court.

This case comes before the court on an interlocutory appeal from the trial court, pursuant to C.A.R. 4.1. The People appeal an order by the trial court suppressing statements made by the defendant while being transported by a sheriff's deputy from a motions hearing to the Larimer County Detention Center. We reverse the order and remand the case for further proceedings consistent with this opinion.

## I.

The defendant, Albert Raymond Gonzales, was arrested on October 31, 1998, for the murder of his girlfriend, Priscilla Sturgeon. At the time of the arrest, the defendant was informed of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and asserted his rights to remain silent and to have counsel present during questioning.

Since his arrest, the defendant has remained in custody at the Larimer County Detention Center. He currently awaits trial on a charge of first degree murder.

On May 20, 1999, Larimer County Sheriff's Deputy Carl O'Neill transported the defendant from a motions hearing at the courthouse to the detention center. No other people were present during the ride.

On the way to the detention center, the defendant began to complain to O'Neill about his legal counsel and the judge presiding over his case. After a short while, the defendant paused and asked O'Neill, "Can I be up front with you?" O'Neill replied, "Sure." The defendant then made the following incriminating statements: "They don't know what I did, they don't have a clue," "I didn't intentionally kill her," and "It was an accident." O'Neill promptly noted the statements on a legal pad for later use at the defendant's trial.

On May 25, 1999, the defendant filed a motion to suppress the incriminating statements. He claimed that the statements were involuntary and were obtained in violation of his rights under the Fifth Amendment to the United States Constitution and *Miranda v. Arizona*.

At the suppression hearing, the trial court found that the defendant's statements were voluntary and that Deputy O'Neill had not acted improperly. Nevertheless, the trial court determined that O'Neill's response to the defendant's question was the functional equivalent of police interrogation. Consequently, the trial court granted the motion to suppress. This appeal followed.

## II.

The Fifth Amendment to the United States Constitution protects a criminal suspect's right to have an attorney present during custodial interrogations. *See Miranda*, 384 U.S. at 444–45, 469–75, 86 S.Ct. 1602; *People v. Sharpless*, 807 P.2d 590, 591 (Colo.1991). Once a suspect in custody invokes his right to an attorney, all interrogation in the absence of counsel must cease. *See Miranda*, 384 U.S. at 474, 86 S.Ct. 1602; *People v. Quezada*, 731 P.2d 730, 734 (Colo.

1987). "Interrogation" refers to express questioning by a police officer as well as to "words or actions . . . that the officer 'should know are reasonably likely to elicit an incriminating response from the suspect.'" *People v. Trujillo*, 784 P.2d 788, 790 (Colo. 1990) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)); *see also People v. MacCallum*, 925 P.2d 758, 766 (Colo.1996); *Sharpless*, 807 P.2d at 591.

■ When determining whether a suspect has been subjected to an interrogation, we consider the totality of the circumstances surrounding the making of the statement. *See Trujillo*, 784 P.2d at 791. We focus our inquiry on whether the officer reasonably should have known that his words or actions would cause the suspect to perceive that he was being interrogated. *See id.* at 790–91.

■ The police must scrupulously honor the suspect's choice to have counsel present during custodial interrogations. *See Quezada*, 731 P.2d at 734. It is clear, however, that the Fifth Amendment and *Miranda* do not prohibit the evidentiary use of volunteered, non-compelled statements made by a suspect in the absence of counsel. *See MacCallum*, 925 P.2d at 766; *Sharpless*, 807 P.2d at 591–92; *People v. Pearson*, 190 Colo. 313, 320–21, 546 P.2d 1259, 1266 (1976); *People v. Smith*, 173 Colo. 10, 475 P.2d 627 (1970). As the United States Supreme Court stated in *Miranda* and repeated in *Innis*,

> Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated . . . .* Volunteered statements of any kind are not barred by the Fifth Amendment. . . .

*Innis*, 446 U.S. at 299–300, 100 S.Ct. 1682 (quoting *Miranda*, 384 U.S. at 478, 86 S.Ct. 1602) (emphasis added in *Innis* ).

In *People v. Sharpless*, for instance, the defendant asked the arresting police officer if he could explain why he pointed a loaded gun at another driver. The officer did not respond, and the defendant proceeded to make inculpatory statements. We held that *Miranda* did not bar the evidentiary use of the statements, because they were made freely and in the absence of coercion by the police. *See Sharpless*, 807 P.2d at 591. The officer's actions—or, more accurately, inaction—simply did not *compel* the defendant to make a statement.

Similarly, in *People v. Smith*, the defendant spontaneously explained to the arresting officer where he obtained a forged receipt for a bet placed at a dog track. The officer testified that he asked no questions concerning what had happened. We held that the officer was under no duty to close his ears to evidence freely offered by the defendant. *See Smith*, 173 Colo. at 13–14, 475 P.2d at 628. Because the statement was not the product of questioning or interrogation, we disapproved the trial court's suppression order. *See id.*

In *Rhode Island v. Innis*, the United States Supreme Court addressed the distinction between compelled statements on the one hand, and volunteered statements on the other. In *Innis*, the police arrested the defendant as a suspect in the homicide of a taxi driver. The murder weapon, a sawed off shotgun, was still missing. While transporting the defendant to the station, the arresting officers engaged in conversation with each other. One officer noted that there was a school for disabled children nearby and that "it would be too bad if . . . a girl . . . would pick up the gun, maybe kill herself." The other officer agreed that they should try to find the gun as soon as possible. At that point the defendant told the officers to turn back and helped them locate the gun. The Court held that, because the defendant spoke voluntarily, *Miranda* did not require suppression of the gun and the defendant's statements. The Court reasoned,

> This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view,

therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

*Innis,* 446 U.S. at 303, 100 S.Ct. 1682.

Examples of functional equivalents of interrogation provided in *Miranda* and *Innis* also guide our decision today. One example involves coaching witnesses to identify the suspect as the perpetrator of the crime. This deception fools the suspect into believing that the police already have substantial evidence of his guilt, motivating him to explain his conduct. *See Innis,* 446 U.S. at 299, 100 S.Ct. 1682 (*citing Miranda,* 384 U.S. at 453, 86 S.Ct. 1602). In another example, police coach witnesses to identify the suspect as the perpetrator of fictitious crimes to induce him to confess to the actual crime of which he is suspected and thereby escape the false prosecution. *See id.* Still other examples include positing the suspect's guilt, minimizing the seriousness of the offense, and casting blame on the victim or society. *See id.* (citing *Miranda,* 384 U.S. at 450, 86 S.Ct. 1602).

■ Although the examples provided in *Innis* and *Miranda* surely do not constitute an exhaustive list, we may infer that the functional equivalents of interrogation generally employ compelling influences or psychological ploys in tandem with police custody to obtain confessions. *See Arizona v. Mauro,* 481 U.S. 520, 529, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). With these principles in mind, we analyze whether, in the instant case, the trial court erred by suppressing the defendant's statements.

### III.

■ When reviewing a trial court's order to suppress an inculpatory statement, the court reviews both factfinding and the application of law. *See People v. Gennings,* 808 P.2d 839, 844 (Colo.1991). While we defer to a trial court's findings of disputed fact, the application of a legal standard to historical fact is a matter for *de novo* appellate review. *See id.*

■ As an initial matter, we note that the parties agree that the defendant was in the custody of the police. The parties further agree that Deputy O'Neill did not actually question the defendant. The sole issue before the court is whether O'Neill's words and conduct constituted the functional equivalent of interrogation.

We conclude that the trial court erred by ordering the suppression of the defendant's statements to Deputy O'Neill. While "interrogation" includes "words or actions ... that the officer 'should know are reasonably likely to elicit an incriminating response from the suspect,'" *see Trujillo,* 784 P.2d at 790 (quoting *Innis,* 446 U.S. at 301, 100 S.Ct. 1682), this definition must be read against the backdrop of the inherently coercive interrogation practices that *Miranda* and its progeny traditionally have sought to address. *See Mauro,* 481 U.S. at 529–30, 107 S.Ct. 1931. As we have noted in the past, the issue is whether the defendant was compelled by the police to make a statement, "'not whether he is allowed to talk to the police without the benefit of warnings and counsel.'" *Gilmore v. People,* 171 Colo. 358, 363, 467 P.2d 828, 830 (1970) (quoting *Miranda,* 384 U.S. at 478, 86 S.Ct. 1602) (emphasis added).

In this case, it may well be that Deputy O'Neill knew or should have known that the defendant was about to make an incriminating statement and that, by responding "Sure," such a statement would in fact be made. Indeed, the trial court went so far as to characterize O'Neill's response as the equivalent of saying, "Absolutely, go right ahead, make a statement." Nevertheless, we cannot conclude that O'Neill's response *compelled* the defendant to make a statement, much less that, based on the totality of the circumstances, O'Neill reasonably should have anticipated that his response would be perceived by the defendant as an interrogation and overcome his desire not to speak about his case.

Deputy O'Neill's response differs little from the silent authorizations at issue in *Sharpless* and *Smith.* A police officer may allow a suspect to make a statement by expressly voicing his consent or by remaining silent. A response explicitly permitting a

defendant to make an inculpatory statement does not rise to the level of police interrogation.

The examples provided in *Miranda* and *Innis* further illustrate that Deputy O'Neill's response was not the functional equivalent of interrogation. Unlike those examples, the facts here contain no suggestion that O'Neill used deception, intimidation, coercion, or lengthy harangues to obtain the defendant's statements.

In this case, as in *Sharpless* and *Smith*, the defendant initiated the conversation. He was not subjected by Deputy O'Neill to any words or actions other than those attendant to the transportation. The record contains no information that would suggest that O'Neill threatened or intimidated the defendant or that he placed the defendant under any other compelling influences. As the trial court observed, nothing indicates that the defendant's statements were anything but voluntary. For his own reasons, the defendant decided to speak freely with O'Neill.

The Fifth Amendment protects defendants from improper forms of police interrogation, not from their own impulses to speak. Consequently, even assuming, *arguendo*, that Deputy O'Neill knew the defendant was asking whether he could make a voluntary, perhaps inculpatory statement, O'Neill did nothing improper by acquiescing.

### IV.

Accordingly, we reverse the order suppressing the statements made by the defendant to Deputy O'Neill during transportation to the corrections center. The case is remanded for further proceedings consistent with this opinion.