**The PEOPLE of the State of Colorado, Plaintiff–Appellant,**

v.

**Henry Guadalupe RIVAS, Defendant–Appellee.**

No. 00SA50.

Supreme Court of Colorado, En Banc.

Oct. 23, 2000.

A.M. Dominquez, District Attorney, Christopher Vogt, Deputy District Attorney, Greeley, Colorado, Attorneys for Plaintiff–Appellant.

Todd Taylor, Greeley, Colorado, Attorney for Defendant–Appellee.

Justice COATS delivered the Opinion of the Court.

The People appealed pursuant to section 16–12–102(2), 6 C.R.S. (2000), and C.A.R. 4.1, challenging the district court's order suppressing certain of the defendant's statements, apparently as the product of custodial interrogation after invocation of his right to counsel. Because the defendant's statements were not made in response to interrogation, the district court's order is reversed and the case is remanded for further proceedings consistent with this opinion.

**1.** §§ 18–8–704, 705(1)(b), 6 C.R.S. (2000).

**2.** § 18–3–206, 6 C.R.S. (2000).

**3.** § 18–3–203(1)(b), 6 C.R.S. (2000).

## I.

Following a report of a shooting incident in Greeley on the night of January 21, 1999, the seventeen-year-old defendant was charged as an adult with three counts of aggravated intimidation of a witness or victim,[1] four counts of felony menacing,[2] and one count of second degree assault.[3] He filed a number of pretrial motions, including a motion to suppress statements he made to police officers on the night he was arrested. The testimony of Detectives Schrimpf and Connell was the only evidence presented at the suppression hearing relative to this particular motion.

According to the uncontradicted testimony of the detectives, the defendant was arrested shortly after witnesses claimed that he assaulted a man with a bat, pointed a gun at the witnesses, and fired several rounds in their direction. He was taken into custody at the Greeley Police Department. Because he was a juvenile at the time, the defendant's father was contacted and asked to come to the police station. After arriving, the father was read a Spanish translation of the *Miranda v. State of Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694[4] rights, and the defendant was read his *Miranda* rights in English in his father's presence. Following a private consultation with his father, the defendant told Detective Connell that he wanted to speak with a lawyer because either way, … he was going to jail. Detective Connell then told the father that the defendant would in fact be going to jail and escorted the father out.

The defendant was rehandcuffed and left in the interviewing room while Detective Connell worked on the attendant bonding paperwork in his office. About ten minutes later, Connell gave the completed paperwork to Detective Schrimpf for the purpose of taking the defendant to jail. However, Schrimpf returned in a moment and notified Connell that the defendant wanted to tell his

**4.** *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

side of the story. Connell testified that he did not initially respond because the defendant's father had already left. However, after another five minutes and several more requests by the defendant, including shouting out to him by name, Connell went to the interview room. When Connell reached the doorway, the defendant asked him what charges were being filed.

The detective responded by reciting the charges, at which point the defendant began talking about the incident and continued for about thirty seconds. The defendant acknowledged that he was present at the confrontation and had a pellet gun, but he claimed that he wasn't shooting at anybody and was just trying to scare people. Detective Connell testified that he then tried to find the defendant's father because he wanted to pursue the defendant's statement with follow-up questions. When it was clear that the father was already gone, the defendant was taken to jail without being questioned.

In its ruling the district court did not make specific findings of fact. It expressly presumed for its holding, however, that there had been an adequate advisement of *Miranda* rights with the defendant's father present. Although the court indicated that once the defendant had a change of heart, the custodial authority was obligated to remirandize the defendant in his father's presence or do something to ensure that [his] age and lack of sophistication were considered, it ultimately appeared to rest its holding on a determination that Detective Connell's response to the defendant's inquiry was likely to elicit an incriminating response. Therefore, notwithstanding its finding that the defendant's statements were voluntary, the district court suppressed them because they were tainted by the whole procedure, including the absence of either a lawyer or the defendant's father at the time the statements were made.

## II.

■ There are two federal constitutional bases for the requirement that a confession be voluntary in order to be admitted into evidence: the Due Process Clause of the Fourteenth Amendment and the Fifth Amendment privilege against self-incrimination. *See Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). The due process test, which is also referred to as the voluntariness test, takes into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation—in determining whether the accused's will was actually overborne by coercive police conduct. *See id.* at 2331; *People v. Valdez,* 969 P.2d 208, 211 (Colo.1998). This test applies to any out-of-court statement of the accused, whether or not the statement was made during custodial interrogation. *See id.*

■ Because the inherently coercive nature of custodial police interrogation heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment, the Supreme Court has also laid down concrete constitutional guidelines governing the admissibility of statements given during custodial interrogation. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Statements made during custodial police interrogation are admissible only if the person making them has already been properly advised concerning his right to remain silent and his right to have a lawyer, and if he has made a voluntary, knowing, and intelligent waiver of those rights. *See id.* at 444, 86 S.Ct. 1602. Once the person in custody invokes his right to a lawyer, all questioning must cease until that request is complied with or he is released. *See id.* at 444–45, 86 S.Ct. 1602; *see also People v. Trujillo,* 773 P.2d 1086, 1092 (Colo. 1989). Furthermore, the police are prohibited from reinitiating contact with the suspect, even to see whether he has changed his mind. *See Edwards v. Arizona,* 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Trujillo,* 773 P.2d at 1092.

By statute in Colorado, the Fifth Amendment privilege of juveniles is further protected by requiring the presence of a parent or guardian during custodial interrogation. *See* § 19–2–511(1), 6 C.R.S. (2000). No statement of a juvenile made as the result of custodial interrogation is admissible unless the juvenile's parent or guardian was present

for the *Miranda* advisement and either the parent or counsel was present during the interrogation. See *id.* It is clear, however, that section 19–2–511(1) mirrors the *Miranda* safeguards in that it applies only to statements made by someone while in custody and responding to interrogation by law enforcement officials. *See People in Interest of J.C.*, 844 P.2d 1185, 1188 (Colo.1993) (characterizing the statute as a codification of the *Miranda* requirements, as extended to juveniles, with the added requirement that an adult be present) (footnote omitted).

■ Although *Miranda* itself referred to custodial interrogation as questioning initiated by law enforcement officers after a person has been taken into custody, 384 U.S. at 444, 86 S.Ct. 1602, *Miranda* was concerned broadly with the 'interrogation environment' created by the interplay of interrogation and custody, and with police techniques or practices that evoke this concern, not all of which involve express questioning. *See Rhode Island v. Innis*, 446 U.S. 291, 299, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Interrogation has therefore not been limited to express questioning but also includes its functional equivalent. It has been characterized as any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Id.* at 301; *see also People v. Gonzales*, 987 P.2d 239, 241 (Colo.1999); *People v. Sharpless*, 807 P.2d 590, 591 (Colo.1991); *People v. Trujillo*, 784 P.2d 788, 790–91 (Colo.1990). In determining whether a person has been subjected to custodial interrogation, courts must consider the totality of the circumstances surrounding the encounter. *See Gonzales*, 987 P.2d at 241. This remains true whether or not that person is a juvenile. *See People in Interest of R.A.*, 937 P.2d 731, 738 (Colo.1997).

■ *Miranda* also made clear that confessions remain a proper element in law enforcement and that volunteered statements of any kind are not barred by the Fifth Amendment. *See Miranda*, 384 U.S. at 478, 86 S.Ct. 1602. Interrogation, as conceptualized in *Miranda*, must therefore reflect a measure of compulsion above and beyond that inherent in custody itself. *See Rhode Island v. Innis*, 446 U.S. at 300, 100 S.Ct. 1682. Practices identified as the functional equivalents of interrogation generally employ compelling influences or psychological ploys in tandem with police custody to obtain confessions. *Gonzales*, 987 P.2d at 242. The ultimate issue for resolution is whether the defendant was compelled by the police to make a statement, not whether he was allowed to talk to the police without the benefit of warnings and counsel. *Id.*

■ A suspect's inculpatory statement is not considered to be the product of custodial interrogation merely because it is made after he has been told the charges against him. *See United States v. Conley*, 156 F.3d 78, 83 (1st Cir.1998); *People v. Roper*, 208 A.D.2d 571, 617 N.Y.S.2d 44, 45 (1994); *State v. Conover*, 312 Md. 33, 537 A.2d 1167, 1171 (1988); *State v. Leak*, 90 N.C.App. 351, 368 S.E.2d 430, 433 (1988). Nor does an officer's direct response to a question initiated by a suspect generally constitute interrogation, even though the suspect is in custody and has already invoked his right to counsel. *See People v. Pierson*, 670 P.2d 770, 774 (Colo.1983) (holding that an officer's response to a direct question, to the effect that a barium antimony test would be affected by shooting a rifle within six hours of the test, was not interrogation).

■ Unlike the voluntariness test, the question whether a statement is the product of police interrogation is determined according to an objective standard, focusing primarily upon the perceptions of the suspect, rather than the intent of the police. *Rhode Island v. Innis*, 446 U.S. at 301, 100 S.Ct. 1682; *Trujillo*, 784 P.2d at 791. The suspect therefore need not prove the subjective intent of a specific police officer, and police awareness of the particular susceptibility of a suspect can be taken into account in determining what an officer should know about the likelihood of eliciting an incriminating response. However, this objective test does not reduce the inquiry to a question of mere probabilities. Even in the face of a clear request by a suspect in custody for permission to make what is likely to be an incrimi-

nating statement, police reaction by either granting permission or remaining silent does not necessarily constitute interrogation. *See Gonzales*, 987 P.2d at 243 (holding that a deputy sheriff's response of, Sure, to defendant's question, Can I be up front with you? did not constitute interrogation); *Sharpless*, 807 P.2d at 591 (reversing the district court's suppression order as to statements made by the defendant in the face of the police officer's silence after the defendant asked if he could explain what happened). The words or actions of the officer must also be such that he should know they will be perceived by the suspect as provocative rather than merely informative or permissive.

### III.

■■■■■ In the context of a suppression motion, a trial court's findings of historical fact are entitled to deference by a reviewing court, but the trial court's application of legal standards to those facts is treated as a question of law to be reviewed de novo. *See Gonzales*, 987 P.2d at 242. When controlling facts are undisputed, even though they are not specifically included in the findings of the trial court, the effect of those facts will also be treated as a matter of law. *See People v. D.F.*, 933 P.2d 9, 15 (Colo.1997). Furthermore, because section 16–12–102(2) and C.A.R. 4.1 provide an interlocutory appeal for the prosecution, but not the defendant, a reviewing court is without jurisdiction to consider on interlocutory appeal issues resolved against the defendant by the trial court. *See People v. Reyes*, 956 P.2d 1254, 1256 (Colo. 1998).

For purposes of the district court's suppression order in the present case, matters that were undisputed or clearly resolved against the defendant included that he was adequately advised of his Miranda rights with his father present; that he invoked his right to counsel; and that no interrogation took place at that time. Some fifteen or twenty minutes later, the defendant initiated contact with Detective Connell by calling out for him and by asking him what charges were being filed. When Detective Connell answered his question, the defendant made

voluntary statements without being prompted by questioning.

Perhaps as important, there was no finding or evidence to suggest that the detective's response was untruthful or was in any way part of a police ploy or deception to provoke the defendant into incriminating himself. It was not part of a lengthy harangue, nor was it embellished with speculation about the defendant's possible punishment or accompanied by suggestions that cooperation might result in lesser charges. *See Gonzales*, 987 P.2d at 242–43. Quite the contrary, the detective's response was limited to information a defendant would normally want, and be entitled, to know upon being taken into custody.

Similarly, there was no evidence that the police were aware of and trying to take advantage of any particular susceptibility of the defendant. In fact there were no particularized findings about the defendant at all. The uncontradicted testimony of the detectives indicated only that they knew he was seventeen years old; that he had been identified as a person who leapt from a car filled with young men, assaulted another man with a bat, and fired several rounds from a rifle in the direction of a group of witnesses; and that he had the presence of mind to request the intercession of counsel before answering police questions.

Under these circumstances, truthfully responding to the defendant's question cannot be objectively characterized as a ploy to evoke an incriminating response any more than could refusing to respond. Because Detective Connell's recitation of the charges, made in direct response to the defendant's inquiry, did not constitute interrogation at all, the defendant's statements were not the product of custodial police interrogation and were therefore not inadmissible as a violation of either *Miranda* or section 19–2–511.

■■■■ To the extent that the trial court's ruling could be read to impose an obligation on law enforcement officers to readvise of Miranda rights or procure the presence of a parent or lawyer before permitting juveniles to volunteer statements, the ruling would be erroneous because no such duty exists. *See People in Interest of R.A.*, 937 P.2d at 738 n.

8 (noting that voluntary statements and admissions of a juvenile would be admissible, even if made outside the presence of a parent). The legislature has provided juveniles with enhanced protections during inherently coercive custodial police interrogation; it has not barred the use of volunteered custodial statements by juveniles. Nor has it legislatively altered the meaning of interrogation as applied to a juvenile to include truthfully answering his questions. Even after a juvenile has invoked the right to counsel during custodial interrogation, law enforcement officials are not obliged to prevent him from reinitiating conversation with them and volunteering information.

The suppression order of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.