The PEOPLE of the State of Colorado,
Plaintiff–Appellant

v.

Anselmo BONILLA–BARRAZA,
Defendant–Appellee.

No. 09SA6.

Supreme Court of Colorado,
En Banc.

June 22, 2009.

Daniel H. May, District Attorney, 4th Judicial District, Laurel Huston, Deputy District Attorney, Laurel Cain, Deputy District Attorney, Doyle Baker, Deputy District Attorney, Colorado Springs, Colorado, Attorneys for Plaintiff–Appellant.

Douglas K. Wilson, Public Defender, Todd Johnson, Deputy State Public Defender, Kimberly C. Chalmers, Deputy State Public Defender, Colorado Springs, Colorado, Attorneys for Defendant–Appellee.

Justice HOBBS delivered the Opinion of the Court.

In this interlocutory appeal brought under C.A.R. 4.1, the prosecution challenges the trial court's order suppressing statements

the defendant, Anselmo Bonilla–Barraza, made while in police custody.[1] Police advised Bonilla–Barraza of his *Miranda*[2] rights after taking him into custody. Bonilla–Barraza then invoked his right to remain silent in two separate interviews, but police subjected him to further interrogation in both of those interviews and in a third interview.

We affirm the trial court's suppression order.[3] We hold, under the totality of the circumstances, that the police violated Bonilla–Barraza's constitutional right to remain silent by continuing to conduct custodial interrogation of him on three occasions after he had clearly invoked that right. Consequently, the statements Bonilla–Barraza made in those interrogations are inadmissible in this case.

## I.

On the evening of April 23, 2008, a 911 dispatcher received a call from a nine-year-old girl, who reported that her parents had been fighting and that her mother was dead. Upon arriving at the trailer where the girl lived, police officers found the mother's body. Bonilla–Barraza, the victim's fiancé, was present at the trailer, along with his three stepchildren aged nine, seven, and six years, and a nine-month-old girl who was the daughter of the victim and Bonilla–Barraza.

The Colorado Springs police transported Bonilla–Barraza and the four children to the police operations center, and placed Bonilla–Barraza in an interview room. At 11:30 p.m., about an hour after Bonilla–Barraza was placed in the interview room and about two and a half hours after the 911 call, Detective Wayne Bichel of the Colorado Springs Police Department began to question Bonilla–Barraza. A translator was present at this inter-

view and at subsequent interviews to interpret for Bonilla–Barraza, who is a native of Mexico and does not speak English.

Detective Bichel initially asked Bonilla–Barraza about personal identifying information, such as his date of birth and occupation, and then read him *Miranda* warnings. Detective Bichel asked, "Having these rights in mind, do you wish to talk to me now?" Bonilla–Barraza answered, "No." Before ending the interview, Detective Bichel asked Bonilla–Barraza a total of twelve further questions about the names, ages, and gender of the children, and which of the four children he had fathered. He also asked whether Bonilla–Barraza had any questions for him, to which Bonilla–Barraza replied, "Not right now, no."

After Detective Bichel ended the interview, Bonilla–Barraza remained in the interview room. The police offered him drinks and restroom visits, took photographs of his body, and told him to change into a jail uniform. At least some of this time, Bonilla–Barraza's stepchildren were playing outside the interview room and could be heard from within the room.

Detective Bichel returned around 2:00 a.m. on April 24. He did not give *Miranda* warnings at this time. After Detective Bichel told Bonilla–Barraza that the children's grandmother had taken the children, the following exchange occurred:

> Detective Bichel: And earlier you said you didn't want to talk to me, have you thought about things more? Do you want to tell me—talk to me now—tell me what happened?
>
> Bonilla–Barraza (via interpreter): Well actually no . . . no.
>
> Detective Bichel: OK. Is there a reason why?

---

**1.** The prosecution presents the following issue for our review:

> Defendant declined to talk in two separate meetings with a police detective, who conducted no interrogation of defendant on either occasion. Defendant waived his right to remain silent at a third interview, and although he informed the detective that he had talked with some attorneys he made no request for those attorneys to be present. Were defendant's

Fifth Amendment rights to silence and counsel violated in these circumstances?

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**3.** Because we determine that the police violated Bonilla–Barraza's right to remain silent, we need not consider whether the police also violated Bonilla–Barraza's right to counsel during custodial interrogation.

Bonilla–Barraza (via interpreter): No, because what happened is bad ... I know you have to do more paperwork for me, but it is just too difficult.

Detective Bichel: With you sitting here, have you come up with any questions for me?

Bonilla–Barraza (via interpreter): Well for now the only question I had was about the kids.

Detective Bichel informed Bonilla–Barraza that he would be transported to a hospital for some tests, and the interview ended.

Detective Bichel interviewed Bonilla–Barraza a third time on the afternoon of April 25, at the county jail. On this occasion, Bonilla–Barraza was wearing a special type of gown for inmates on suicide watch. Detective Bichel did not read Bonilla–Barraza his *Miranda* rights during the initial part of this interview. The following exchange occurred:

Detective Bichel: And like I said, you remember me from the other night when we spoke? And, um ... I respected you when you said you didn't want to talk to me. OK, so but on the same hand trying to treat you like a man, you know everyone.... Obviously my goal and my job is to find out what happened because I wasn't there.

Bonilla–Barraza (via interpreter): Yes, I understand.

Detective Bichel: And one of ... you know, obviously there are different ways we try to figure out what happened based on evidence, based on talking to the kids.

Bonilla–Barraza: Yeah.

Detective Bichel: But I would like to do [sic] is get from you what actually happened. That way maybe I can make sense out of this whole situation. Does that make sense to you?

Bonilla–Barraza: Yeah.

Detective Bichel: Would you like to tell me what happened?

Bonilla–Barraza: OK.

Detective Bichel then read *Miranda* warnings to Bonilla–Barraza. At this time, Bonilla–Barraza told Detective Bichel that some attorneys had come to the jail to speak with him the previous day, and that he had "told them [he] wanted to talk with them because [he] was ready to tell the truth." Bonilla–Barraza stated that the attorneys had told him they should be present during questioning. He further stated that the attorneys had "told him they could be here within five minutes if he wanted to call them," and that he was "scared" to answer Detective Bichel's questions. Detective Bichel responded, "If you want them here that's fine or if you are comfortable sitting here talking with us it is not—ultimately it is not going to make a huge difference other than help me understand." Bonilla–Barraza then stated that, because Detective Bichel had "treated him really well," Bonilla–Barraza would "treat [Detective Bichel] really well," and agreed to answer the questions.

After signing a written waiver of his *Miranda* rights, Bonilla–Barraza gave a statement in which he gave incriminating details about his role in the death of his fiancée. Because this confession was only audiotaped, Detective Bichel arranged for Bonilla–Barraza to be transported to the police operations center to give a videotaped interview. About an hour later, after receiving another *Miranda* advisement and signing a second *Miranda* waiver, Bonilla–Barraza gave a videotaped interview in which he again provided incriminating information.

On May 7, 2008, the prosecution charged Bonilla–Barraza with one count of first degree murder after deliberation (a class one felony under section 18–3–102(1)(a), C.R.S. (2008)); a crime of violence count (a sentence enhancer under section 18–1.3–406(2)(a)(I)(B), C.R.S. (2008)); and four counts of child abuse (a class two misdemeanor under section 18–6–401(1), (7)(b)(I), C.R.S. (2008)).

After a preliminary hearing, the court bound over the case on all charges. Bonilla–Barraza entered a plea of not guilty, and the matter was set for trial. He then filed a motion to suppress the statements he made while in police custody.

Following a hearing, the El Paso County District Court granted Bonilla–Barraza's suppression motion on December 19, 2008.

The court held that, while Bonilla–Barraza's Sixth Amendment right to counsel was not violated and his statements were voluntary, Bonilla–Barraza's Fifth Amendment rights to remain silent and to counsel during custodial interrogation were violated.

Upon the trial court's denial of the prosecution's motion for reconsideration, the prosecution filed this interlocutory appeal.

## II.

We hold, under the totality of the circumstances, that the police violated Bonilla–Barraza's constitutional right to remain silent by continuing to conduct custodial interrogation of him on three occasions after he had clearly invoked that right. Consequently, the statements Bonilla–Barraza made in those interrogations are inadmissible in this case.

### A. Standard of Review

■ In suppression cases, which typically involve a mixed question of fact and law, we defer to the trial court's factual findings if competent evidence in the record supports them, and we review the court's ultimate legal conclusion de novo. *People v. Arroya,* 988 P.2d 1124, 1129 (Colo.1999).

### B. The Right to Remain Silent during Custodial Interrogation

■ Before conducting a custodial interrogation of a suspect, police must inform the suspect "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); U.S. Const. amend. V. A suspect may cut off questioning at any time during a custodial interrogation by clearly articulating a wish to remain silent.[4] *Arroya,* 988 P.2d at 1129–30; *see also Miranda,* 384 U.S. at 473–74, 86 S.Ct. 1602.

The suspect must specifically waive the right to remain silent for police to proceed with a custodial interrogation. *Arroya,* 988 P.2d at 1129–30; *see also Miranda,* 384 U.S. at 479, 86 S.Ct. 1602.

■ An interrogation is custodial when it is "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. A suspect is "interrogated" for *Miranda* purposes

> whenever the suspect "is subjected to either express questioning or its functional equivalent." Thus, interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."

*People v. Madrid,* 179 P.3d 1010, 1014 (Colo. 2008) (quoting *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)).

■ We conduct a totality of the circumstances inquiry to determine whether an officer interrogated a suspect. *People v. Gonzales,* 987 P.2d 239, 241 (Colo.1999). This inquiry focuses on whether the officer reasonably should have known that the officer's words or actions would cause the suspect to perceive that he or she was being interrogated, whether those words or actions were calculated to elicit incriminating statements, and whether in light of the interrogation environment the police compelled the incriminating statements. *See id.* at 241–42.

■ An "'interrogation environment' created by the interplay of interrogation and custody [may] 'subjugate the individual to the will of his examiner' and thereby 'undermine the privilege against compulsory self-incrimination.'"[5] *Innis,* 446 U.S. at 299,

---

4. "[A] suspect must clearly articulate the desire to remain silent so that a reasonable police officer in the circumstances would understand the suspect's words and conduct to mean that the suspect is asserting her *Miranda* right to cut off questioning, thereby requiring the police to respect fully the suspect's exercise of this right."

*People v. Arroya,* 988 P.2d 1124, 1129–30 (Colo. 1999).

5. The U.S. Supreme Court recently reemphasized its concern about "prevent[ing] police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Montejo v. Louisi-*

100 S.Ct. 1682 (quoting *Miranda*, 384 U.S. at 457–58, 86 S.Ct. 1602). In conducting our inquiry into words and actions of the police, we consider a variety of factors, including the suspect's "harried emotional state," the nature of the charges, and the questioner's use of "relationship-building" efforts. *People v. Wood*, 135 P.3d 744, 751 (Colo.2006).

■■■■ While *Miranda* established that the police must respect a suspect's expressed wish to remain silent, *Miranda* did not resolve what circumstances, if any, permit a resumption of questioning. *See People v. Quezada*, 731 P.2d 730, 733 (Colo.1987). *Miranda* did not create a "per se proscription of indefinite duration" upon any further police questioning after a suspect invokes the right to remain silent. *Michigan v. Mosley*, 423 U.S. 96, 102–03, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Instead, as *Mosley* held:

> A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt "fully effective means ... to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored...." The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored."

*Id.* at 103–04, 96 S.Ct. 321 (quoting *Miranda*, 384 U.S. at 474, 479, 86 S.Ct. 1602). Thus, once a suspect has clearly articulated the wish to remain silent, additional circumstances must justify resumption of questioning by the police. *Arroya*, 988 P.2d at 1135.

■■■■ To determine whether the police "scrupulously honored" a suspect's expressed wish to remain silent, we consider the particular circumstances in which the police obtained the suspect's statement. *Quezada*, 731 P.2d at 733–34. We focus on four factors enumerated in *Mosley*: (1) whether the police immediately ceased the initial interrogation upon the suspect's request; (2) whether the police resumed questioning only after the passage of a significant period of time; (3) whether the police gave a fresh set of *Miranda* warnings prior to the second interrogation; and (4) whether the second interrogation was restricted to a crime that was not the subject of the first interrogation. *Id.* None of these factors is conclusive, and this list is not exhaustive.[6] *Id.*

Each of the four *Mosley* factors is self-explanatory, with the exception of the second factor, for which the *Mosley* decision "did not suggest any talismanic durational minimum." *United States v. Hsu*, 852 F.2d 407, 410 (9th Cir.1988). *Mosley* held that police fully honored the suspect's right to remain silent where the first interviewer immediately ceased interrogation, a second interviewer resumed questioning after two hours, the second interviewer gave fresh *Miranda* warnings at the outset of the second interview, and the interviews addressed different crimes. 423 U.S. at 104–05, 96 S.Ct. 321.

Our case law has analyzed the second *Mosley* factor in terms of whether an interval is a "significant period of time." *Quezada*, 731 P.2d at 733–34. In *Quezada*, we held that police scrupulously honored the suspect's rights where the first interviewer immediately ceased interrogation, a second interviewer (who did not know of the first interview)

---

*ana*, —— U.S. ——, 129 S.Ct. 2079, 2085, 173 L.Ed.2d 955 (2009) (internal quotation omitted).

**6.** Other factors courts have considered include whether the physical setting of the interviews changed in a manner that alleviated pressure, *United States v. Hsu*, 852 F.2d 407, 412 (9th Cir.1988); whether police conducted themselves in a restrained manner, *id.* at n. 4; whether police engaged in subterfuge, *id.*; whether the police questioned a suspect multiple times, *see United States v. Hernandez*, 574 F.2d 1362, 1368 (5th Cir.1978); and whether the police applied psychological pressure, such as by ominously describing prison, *United States v. Olof*, 527 F.2d 752, 753–54 (9th Cir.1975).

resumed questioning after forty-five minutes, the second interviewer gave fresh *Miranda* warnings prior to interrogation, and both interviews concerned the same crime. *Id.* at 734–36.

Courts generally decline to apply bright-line rules with respect to the second *Mosley* factor, preferring to conduct a comprehensive analysis of all factors. *See, e.g., Hsu,* 852 F.2d at 408, 412 (while a thirty-minute interval between questioning "might ordinarily incline [the court] toward a conclusion that [the] right to cut off questioning was not respected," other applicable factors demonstrated that officers scrupulously honored the defendant's rights). In two cases, courts have held that the police did not scrupulously honor the right to remain silent where intervals of forty-five minutes and three hours occurred between questioning. *See United States v. Hernandez,* 574 F.2d 1362, 1369 (5th Cir.1978); *United States v. Olof,* 527 F.2d 752, 753 (9th Cir.1975). An interval of twenty-four hours is generally considered significant under *Mosley.*[7] *See, e.g., Jackson v. Wyrick,* 730 F.2d 1177, 1180 (8th Cir.1984).

### C. Application to this Case

Here, the issue is not whether Bonilla–Barraza was in police custody once police had transported him to the police operations center.[8] The prosecution also does not challenge the trial court's finding that Bonilla–Barraza clearly articulated his right to remain silent.[9]

Instead, the prosecution argues that the police complied with *Miranda* and its progeny because Detective Bichel "asked only a few questions of defendant—none of which constituted 'interrogation'—after defendant

invoked the right, and he did not interrogate defendant until defendant freely and voluntarily waived his right to remain silent." The prosecution further contends that Detective Bichel scrupulously honored Bonilla–Barraza's right to remain silent during each interview.

### 1. Whether the Police Conducted Interrogations

 We begin our analysis of this issue by briefly reviewing the relevant facts and circumstances. On April 23, Bonilla–Barraza told Detective Bichel that he did not want to talk to him. Yet Detective Bichel asked Bonilla–Barraza twelve further questions about the children. On April 24, Bonilla–Barraza once again said he did not want to tell Detective Bichel what happened. Detective Bichel asked, "Is there a reason why?" He further asked, "With you sitting here, have you come up with any questions for me?" Finally, on April 25, Detective Bichel voiced a desire to "find out what happened," and stated, "I would like to do [sic] is get from you what actually happened." He then asked, "Would you like to tell me what happened?"

Under the totality of the circumstances, we agree with the trial court that Detective Bichel's interviews on April 23, April 24, and April 25 constituted interrogation after Bonilla–Barraza had clearly invoked his right to remain silent. Several circumstances set a relevant backdrop for understanding whether these interviews amounted to interrogation or its functional equivalent. The first two interviews that occurred on April 23 and April 24 took place in the middle of the night, shortly after the death of Bonilla–Barraza's fiancée, with whom he had a child. Bonilla–

---

7. It should be noted that the interval between questioning can "cut both ways under *Mosley*," in that police may inappropriately use "the coercive effect of incarceration to convince the suspect to speak" by delaying too long before questioning. *United States v. Reid,* 211 F.Supp.2d 366, 376 n. 7 (D.Mass.2002).

8. The trial court did not explicitly address whether Bonilla–Barraza was in "custody" for *Miranda* purposes. However, the court's conclusion that Bonilla–Barraza was subject to *Miranda* protections indicates that the court implicitly determined that Bonilla–Barraza was in "custody."

9. The record supports the trial court's determination that Bonilla–Barraza invoked his right to remain silent. During the interview on April 23, Detective Bichel asked, "Having these rights in mind, do you wish to talk to me now?" Bonilla–Barraza answered, "No." On April 24, Detective Bichel asked, "And earlier you said you didn't want to talk to me, have you thought about things more? Do you want to tell me—talk to me now—tell me what happened?" Bonilla–Barraza replied, "Well actually no . . . no."

Barraza was under investigation for the murder of his fiancée. *See Wood*, 135 P.3d at 751. He does not speak English, and spoke with Detective Bichel through an interpreter. After the first interview, police took photographs of Bonilla–Barraza's body and told him to change into a jail uniform, and they subsequently transported him from the ten-foot by ten-foot interview room to jail.

During the first interview, the children could be heard playing from within the interview room. During the third interview, which occurred on April 25, Bonilla–Barraza was dressed in clothing identifying him as a suicide risk. He told Detective Bichel that attorneys he had talked to told him they should be present during questioning, but Detective Bichel responded that it would not "make a huge difference" whether the attorneys were present. The factual circumstances of the three interviews demonstrate Bonilla–Barraza's "harried emotional state" in the context of the continued police questioning. *See id.*

Though Detective Bichel's questions on April 23 about Bonilla–Barraza's child and stepchildren were not overt attempts to extract a confession, the questions constituted interrogation, under the totality of the circumstances. Notably, the children were witnesses to events connected with a death in the household, and these express questions about the children might well have elicited incriminating information. While "interrogation" does not include words or actions of the police which are "normally attendant to arrest and custody," *Innis*, 446 U.S. at 301, 100 S.Ct. 1682, Detective Bichel's failure to ask about the children before providing a *Miranda* advisement, when he initially asked Bonilla–Barraza about personal identifying information, demonstrates that these questions were not part of a procedure "normally attendant to arrest and custody."[10] If the police had needed further information about the names, ages, and paternity of the chil-

dren to provide for their safety, and had not already learned this information when transporting the family to the police station, surely Detective Bichel could have asked such questions before the interrogation commenced.[11] While exigent circumstances might in some cases justify questioning a defendant about family members or children after police have asked a defendant questions "normally attendant to arrest and custody" and after a defendant has invoked his right to remain silent, such exigent circumstances were not present here. *See Beagel v. State*, 813 P.2d 699, 706 (Alaska App.1991) (explaining that where police interviewed suspect in her home immediately after alleged crime and she invoked her right to remain silent, subsequent question as to whether suspect had any children was designed to ensure there were no children who needed attention, not to elicit incriminating information).

Detective Bichel's question on April 24 about why Bonilla–Barraza did not wish to talk to him is a clear case of interrogation after the suspect had invoked his right to remain silent. Given his background and training, Detective Bichel knew there was a reasonable likelihood that Bonilla–Barraza would provide incriminating information in response to this question. A natural reason for a suspect not to want to talk to an officer is that the suspect does not want to share damaging information. Indeed, Bonilla–Barraza responded with a statement a jury probably would deem to be inculpatory: "No, because what happened is bad...." Another clear instance of interrogation occurred in the interview of April 25 when Detective Bichel asked Bonilla–Barraza "what happened" on the night of the victim's death.

### 2. Whether the Police Scrupulously Honored the Right to Remain Silent

■ The trial court found that Detective Bichel continued in the first interview to

---

**10.** *See, e.g., Hibbert v. State,* 195 Ga.App. 235, 393 S.E.2d 96, 97–98 (1990) (asking for names or addresses of a defendant's family members, in order to complete a standard form the police are statutorily required to fill out as part of a procedure normally attendant to arrest and custody, does not constitute interrogation for *Miranda* purposes). In this case, the trial court did not find that the questions were part of a procedure

"normally attendant to arrest and custody," and the prosecution does not directly argue as much.

**11.** The police could have determined the children's names and ages before the interrogation by asking the eldest child, who had called 911 to report the victim's death.

question Bonilla–Barraza after Bonilla–Barraza clearly stated he did not wish to speak to Detective Bichel. Although the trial court recognized that these questions did not directly address the crime, the court found that Detective Bichel's conduct probably caused some doubt in Bonilla–Barraza's mind about his assertion of his right to remain silent. The court also found that Detective Bichel, in the second interview, continued questioning after Bonilla–Barraza stated he did not wish to talk. Citing the *Mosley* factors, the court concluded:

> In this case, questioning continued on both occasions even though the Defendant stated that he did not wish to speak with Detective Bichel. When questioning resumed by Detective Bichel on the second occasion, Defendant was not re-advised of his rights. He was simply reminded that he had previously chosen not to speak with the Detective. Finally, the Detective made no effort to clarify or to discuss the Defendant's statement that he did not wish to speak any further. Based on the circumstances, the Court finds that the Defendant clearly invoked his right to remain silent and any statements by Defendant after that invocation must be suppressed.

We apply the *Mosley* analysis to determine whether the trial court correctly held that Bonilla–Barraza's right to remain silent was not scrupulously honored. As the trial court found, Detective Bichel did not comply with the first *Mosley* factor because he did not immediately cease interrogation on April 23 when Bonilla–Barraza stated he wished to remain silent. Instead, Detective Bichel asked Bonilla–Barraza twelve questions about the children. The fact that these questions immediately followed Bonilla–Barraza's invocation of his right to remain silent provided an unmistakable signal that the police did not intend to honor Bonilla–Barraza's right. With respect to the second *Mosley* factor, the second interview took place about two and a half hours after the first interview, and the third interview occurred a day and a half later. In this case, the length of the first interval does not weigh strongly in either party's favor. *Compare Mosley*, 423 U.S. at 104–05, 96 S.Ct. 321 (two-hour interval occurred between questioning; suspect's rights were honored), *with Hernandez*, 574 F.2d at 1369 (forty-five minute interval occurred between questioning; suspect's rights were *not* honored). The interval between the second and third interviews, on the other hand, certainly was a "significant period of time." *See, e.g., Jackson*, 730 F.2d at 1180 (twenty-four hour interval occurred between questioning; suspect's rights were honored). Detective Bichel did not comply with the third *Mosley* factor, because he failed to re-advise Bonilla–Barraza of his *Miranda* rights at the outset of the second and third interviews. Lastly, all three interviews concerned the same alleged crime.

Analysis of the *Mosley* factors leads us to conclude that the police did not scrupulously honor Bonilla–Barraza's right to remain silent during any of the three interviews. Detective Bichel failed to immediately cease interrogation during the first interview; he did not provide fresh *Miranda* warnings at the second interview or at the beginning of the third interview; and he questioned Bonilla–Barraza about the same crime during all three interviews. Detective Bichel also cast doubt on the effect of Bonilla–Barraza's representation by an attorney: "ultimately it is not going to make a huge difference other than [to] help me understand." In effect, Detective Bichel told Bonilla–Barraza that the only reason to have an attorney is to help the police understand what he did to the victim.

### 3. Conclusion

This is not a case where a suspect volunteered incriminating information. Instead, Detective Bichel's words and actions demonstrated to Bonilla–Barraza that his effort to remain silent would not be respected. Although Bonilla–Barraza made a full confession to the police, this confession resulted from a calculated and persistent campaign by the interrogating detective to elicit such a confession despite Bonilla–Barraza's clearly expressed desire to remain silent. Under the totality of the circumstances, we conclude that the police conducted custodial interrogation to obtain the confession. *Gonzales*, 987 P.2d at 241–42. We further conclude that the police did not scrupulously honor Bonil-

la–Barraza's expressed desire to remain silent. *Mosley*, 423 U.S. at 103–04, 96 S.Ct. 321; *Quezada*, 731 P.2d at 733–34. Thus, in its case-in-chief, the prosecution may not use statements Bonilla–Barraza made under custodial interrogation after invoking his constitutional right to remain silent.

## III.

Accordingly, we affirm the trial court's suppression order and return the case for further proceedings.

Justice EID concurs in the judgment, and Justice COATS joins in the concurrence.

Justice EID, concurring in the judgment.

I agree with the majority's conclusion that the detective in this case did not "scrupulously honor" the defendant's right to remain silent, but disagree with the analysis it employs to reach that conclusion. First, contrary to the majority's analysis, maj. op. at 1096, the detective did in fact cease interrogation when the defendant initially invoked his right to remain silent. The questions the detective posed to the defendant after he invoked the right, which requested that he identify and give the ages of the four young children who had accompanied him to the station just before midnight on April 23, did not constitute interrogation because they were attendant to arrest and custody and necessary to protect the safety of the children. *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (questions "attendant to arrest and custody" do not constitute "interrogation"). Second, the majority gives virtually no weight to the fact that there was a lapse of a day-and-a-half between the second interview (during which the defendant reaffirmed his right to remain silent) and the third interview (during which he confessed). Maj. op. at 1098. Such a significant break in events—during which the defendant changed locations and spoke with an attorney—should be given considerable weight in the totality of the circumstances. *Michigan v. Mosley*, 423 U.S. 96, 104–06, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (finding the passage of two hours to be significant). I agree, however, with the result reached by the majority because, during the third interview, the detective sought to convince the defendant to abandon his earlier invocation of the right to remain silent by diminishing the importance of having an attorney present during questioning. I therefore concur only in the judgment reached by the majority.

## I.

First, the majority finds that the police detective did not cease interrogating the defendant once he invoked his right to remain silent at the initial interview. Maj. op. at 1097; *see also Mosley*, 423 U.S. at 106, 96 S.Ct. 321 (one factor to consider is whether interrogation ceased once the defendant invoked his right to remain silent). The majority points to the fact that the detective asked the defendant to identify and give the ages of the children who were transported with him to the police station on the night that the victim was killed. While the majority characterizes these questions as interrogation, maj. op. at 1097, there is no support for that conclusion.

On the night of April 23, 2008, police arrived at defendant's home to find the victim, who had apparently been strangled to death; her four young children (ages nine, seven, six, and nine months); and the defendant. At 11:30 pm, the defendant and the four children were transported to the police station, where the defendant was placed in an interview room. The defendant was given his *Miranda* rights, and he said that he did not want to talk to the police. It is undisputed that at this point the police detective asked the defendant no further questions about the death of the victim.

The detective did go on to ask the defendant to identify and give the ages of the children. For example, the detective asked, "How many—you know there are four kids though—you have four kids?," to which the defendant (through an interpreter) replied, "Yes." The detective then asked, "Can you tell me their names and ages to make sure I understand all that?" The defendant (through an interpreter) answered, "Jasmine Munoz." The detective asked, "And how old is Jasmine?" And the defendant (through an

interpreter) answered, "Nine years old." Similar questions and responses were given for the other three children. As the detective later testified, he asked about the children to "identify the kids."

The majority holds that these questions constituted "interrogation," concluding that "[t]hough [the detective's] questions . . . were not overt attempts to extract a confession, . . . the children were witnesses to events connected with a death in the household, and these express questions about the children might well have elicited incriminating information." Maj. op. at 1097. Yet the detective did not ask the defendant about what the children witnessed, or could have witnessed, at the home that night. Instead, the questions asked by the detective were strictly limited to obtaining identification of the children. As we have held, "[i]nterrogation includes any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." People v. Wood, 135 P.3d 744, 749–50 (Colo.2006) (citing Innis, 446 U.S. at 301, 100 S.Ct. 1682). Here, the questions were not reasonably likely to elicit incriminating responses, but rather the names and ages of the children—in other words, precisely what the questions did in fact yield.

Furthermore, the majority recognizes that booking questions—that is, requests for identifying information from the defendant—are not to be deemed interrogation. See, e.g., Innis, 446 U.S. at 301, 100 S.Ct. 1682 (questions "attendant to arrest and custody" do not constitute "interrogation"); Wood, 135 P.3d at 749–50 (same); maj. op. at 1097 (citing Innis). But the majority goes on to hold that the questions posed to the defendant in this case regarding the names and ages of the children are not analogous to booking questions because they are not asked of every defendant who comes to the station house. Maj. op. at 1097, 1097 n. 10. Yet there is a simple reason why every de-

fendant is not asked the names and ages of the young children who accompanied him to the police station—namely, that such a situation does not arise in every case, or perhaps even in a large number of cases. That such questions are not asked of every defendant does not mean that they were not "attendant to arrest and custody" with regard to *this defendant*.

The majority also objects to the questions based on timing, suggesting that they could have been asked "before providing a *Miranda* advisement" and "before the interrogation commenced," and instead were asked "after . . . questions 'normally attendant to arrest and custody' and after [the] defendant [ ] invoked his right to remain silent." Maj. op. at 1097. Yet the majority cites no authority for the proposition that every question posed after a *Miranda* advisement has been given and the right to remain silent has been invoked constitutes "interrogation." On the contrary, in *Innis*, the Supreme Court held that a conversation between police officers that prompted the defendant to incriminate himself did not constitute "interrogation" of the defendant because the police officers "should [not] have known" that it was "reasonably likely to elicit an incriminating response" from the defendant—despite the fact that the defendant had received repeated *Miranda* warnings and had invoked his right to counsel. 446 U.S. at 302, 100 S.Ct. 1682. In other words, the determination of whether interrogation occurred depends not on the *timing* of the questions, as the majority seems to suggest, but rather on the *character* of the questions posed (that is, whether the police should have known that the questions were reasonably likely to elicit an incriminating response). See *Innis*, 446 U.S. at 302, 100 S.Ct. 1682. Again, in this case, the questions did not constitute interrogation because they were reasonably likely to elicit the names and ages of the children, not incriminating information.[1]

---

1. I note that the district court's opinion provides no support for the majority's conclusion that the questions constituted interrogation. The district court made no finding as to whether the questions constituted interrogation. Instead, the court concluded that "questioning continued," which "may have caused some doubt in the Defendant's mind about the assertion of his rights in this case." But again, as noted above, the issue is not whether any sort of questioning continued, but rather whether interrogation continued. I would hold that it did not.

In my view, faulting the police for asking the defendant for the names and ages of the children who accompanied him to the police station that night simply defies common sense. The police found themselves with four young children at the station; it was just before midnight; the children's mother had just been killed; and they were quite young—ages nine, seven, six and nine months. Under these circumstances, the children could not be expected to accurately provide information about themselves to the police. The *only person who could do so was the defendant.* It was therefore plainly reasonable for the police to inquire about the names and ages of the children. Indeed, it would have been utterly negligent for the police not to obtain such information before placing them with a relative or social services.

In sum, unlike the majority, I would find that the detective stopped all interrogation once the right to remain silent was invoked during the initial interview, and asked only those questions necessary to identify and protect the safety of the children.

## II.

Second, unlike the majority, I would give little weight to what occurred during the second interview (which did not produce a confession), and give significant weight to the fact that there was a day-and-a-half break between the second and third interviews. During this time, the defendant changed locations and spoke with an attorney. Such a significant break in events should be given considerable weight in the totality of the circumstances. *Mosley,* 423 U.S. at 104–06, 96 S.Ct. 321 (relying on similar factors to find that defendant's right to counsel was scrupulously honored).

Regarding the second interview, the record shows that two-and-a-half hours after the initial interview, around 2:00 a.m. on the morning of April 24, the detective came back to the interview room. He told the defendant that the children's grandmother had taken the children from the police station and that they were safe. He then reminded the defendant that he had invoked his right to remain silent earlier, and asked, "[H]ave

you thought about things more? Do you want to tell me—talk to me now—tell me what happened?" And the defendant (through an interpreter) responded, "Well actually no ... no." The detective then said, "OK. Is there a reason why?" And the defendant (through an interpreter) responded, "No, because what happened is bad...."

It is significant that the detective waited two-and-a-half hours to approach the defendant again about whether he wanted to talk. *See Mosley,* 423 U.S. at 104–05, 96 S.Ct. 321 (noting that two hours had passed and ultimately holding that defendant's right to remain silent was respected). It is also significant, I believe, that the detective reminded the defendant that he had not wanted to talk earlier. Although, as the majority points out, the detective did not re-mirandize the defendant, maj. op. at 1092, such repeated *Miranda* warnings are not necessary, especially given that the detective reminded the defendant that he had not wanted to talk earlier, and the defendant said he still did not want to talk. *Cf. United States v. Rodriguez–Preciado,* 399 F.3d 1118, 1129–30 (9th Cir.2005) (finding officers properly mirandized defendant at the scene and finding no need to remirandize the defendant a day later when interrogation began anew at the jail).

Once the defendant stated he still did not want to talk, however, the detective should not have asked him, "Is there a reason why?"—a question that amounted to interrogation. Maj. op. at 1097. But, as the Supreme Court made plain in *Mosley,* whether interrogation stopped once the defendant invokes his right to remain silent is only one factor to be considered in the totality of the circumstances. *See Mosley,* 423 U.S. at 106, 96 S.Ct. 321 (whether interrogation stopped once right is invoked is only one factor to be considered). Here, although the question, "Is there a reason why?" was a "misstep," it does not *require* suppression. *See, e.g., United States v. Wyatt,* 179 F.3d 532, 538 (7th Cir.1999) (finding the officers' discussion of the evidence against the defendant before they re-mirandized him was a "misstep" but did not constitute a violation of *Mosley); see also Mosley,* 423 U.S. at 101–02, 96 S.Ct. 321

(differentiating between the totality of the circumstances test to be applied in the context of the right to remain silent and the bright-line test of *Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), subsequently known as the *Edwards* rule, *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), to be applied in the context of the right to counsel). In fact, unlike the majority, I would not assign significant weight to the question because it did not produce a confession. On the contrary, the defendant (through an interpreter) stated that "what happened is bad ... I know you have to do more paperwork for me, but it is just too difficult." Thus, the defendant restated his unwillingness to talk, and the interview ended.[2]

As for the third interview, the record shows that a day and a half passed before the detective and the defendant spoke again on the afternoon of April 25. Even the majority acknowledges that a day and a half is a "significant period of time." Maj. op. at 1098. During that elapsed time, the defendant was transferred from the station house to jail, *see Mosley,* 423 U.S. at 104, 96 S.Ct. 321 (noting that a new location for a subsequent interrogation is a relevant factor in assessing whether the defendant's right to remain silent has been "scrupulously honored"), and consulted with an attorney. The majority puts virtually no weight on the fact that a considerable amount of time passed between the second and third interviews. Maj. op. at 1098. In my view, such a significant break in events—during which the defendant changed locations and spoke with an attorney—should be given considerable weight in the totality of the circumstances. *Mosley,* 423 U.S. at 104–06, 96 S.Ct. 321 (noting factors to be considered in assessing whether the right to remain silent was "scrupulously honored"). In sum, in my view, the majority puts too much weight on the second interview, which did not yield a confession,

and too little weight on the significant break between the second and third interviews.

### III.

Despite my disagreement with the majority's analysis, however, I would agree with the majority's outcome in this case based on the fact that, during the third interview, the detective attempted to talk the defendant out of his previous decision to remain silent by diminishing the importance of having an attorney present during the interview.

The detective began the interview by reminding the defendant that he had invoked his right to remain silent earlier, and ultimately asked the defendant whether he wanted to tell him what happened that evening. The defendant answered, "OK," after which the detective read him the *Miranda* warnings. After reading the warnings, the detective asked the defendant if he understood them. The defendant (through an interpreter) said, "Yes," but then went on to say that "there [were] some attorneys that showed up. I told them I wanted to talk with them because I was ready to tell the truth." The defendant (through an interpreter) also stated that the attorneys had told him that "they should be present when he is questioned;" that they had given him "some business cards and told him they could be here within five minutes if he wanted to call them;" that "[h]e knows what he did was wrong;" and that he was "scared to answer [the detective's] questions."

In response to the defendant's statements, the detective said, "I appreciate that," adding that "those people [the attorneys] coming to talk to you ... the[ir] job is to try to give you any legal advice," while "my job is to try to figure out what happened." At that point, the detective stated, "If you want them here that's fine or if you are comfortable sitting here talking with us it is not—ultimately it is not going to make a huge difference other than [to] help me understand." The defen-

---

2. Contrary to the majority's suggestion, maj. op. at 1097, the statement "No, because what happened is bad ...." is not necessarily inculpatory, as it was readily apparent that what had happened that evening was "bad." Certainly the defendant did not "let the cat out of the bag," so to speak, by confessing to the crime. *Cf. Oregon*

*v. Elstad,* 470 U.S. 298, 301, 317–18, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (where Miranda warnings were not given and the defendant let the "cat out of the bag" by giving an inculpatory statement, the subsequent inculpatory statement given after Miranda warnings was admissible).

dant ultimately told the detective to "go ahead" with the interview, during which he confessed.

In this last exchange before the defendant confessed, the detective diminished the importance of having an attorney at interrogation by stating that having one present "is not going to make a huge difference," and by describing the purpose of an attorney as simply to "help [the detective] understand." These statements sought to convince the defendant to set aside his earlier invocation of the right to remain silent and to talk to the detective without an attorney present. Thus, while many of the circumstances to be considered in the totality of the circumstances point to finding that the defendant's right to remain silent was scrupulously honored, as noted above, these statements weigh heavily in the other direction. Ultimately, given that the detective made statements directly aimed at convincing the defendant to set aside his earlier invocation of the right to remain silent and to talk to him outside of the presence of an attorney, I cannot say that, under the totality of the circumstances, the defendant's invocation of his right to remain silent was "scrupulously honored." *Mosley*, 423 U.S. at 104–06, 96 S.Ct. 321. I therefore come to the same conclusion reached by the majority, and concur only in its judgment.

I am authorized to state that Justice COATS joins in this concurrence.