2014 CO 43

**The PEOPLE of the State of Colorado, Plaintiff-Appellant**

v.

**Jack Lee SCHAUFELE, Defendant-Appellee**

**Supreme Court Case No. 13SA276**

Supreme Court of Colorado.

June 2, 2014

Attorneys for Plaintiff-Appellant: George H. Brauchler, District Attorney, Eighteenth Judicial District, L. Andrew Cooper, Chief Deputy District Attorney, Centennial, Colorado.

Attorneys for Defendant-Appellee: Foster Graham Milstein & Calisher, LLP, Daniel S. Foster, Lindsay N. Hutchinson, Chip G. Schoneberger, Denver, Colorado.

JUSTICE HOOD announced the judgment of the Court.

¶ 1 Jack Lee Schaufele was involved in a motor vehicle accident that resulted in injuries to himself and others. One hour and four minutes later, while Schaufele lay unresponsive at the hospital, a police officer told a nurse to draw Schaufele's blood for alcohol analysis. It is undisputed that the officer and her co-workers never considered applying for a search warrant. The People later sought to use evidence from that blood draw in prosecuting Schaufele for vehicular assault, driving under the influence, driving under the influence per se, and careless driving.

¶ 2 In this interlocutory appeal, we consider whether the trial court applied the proper legal test when it suppressed evidence stemming from the blood draw. The People also ask us to adopt a new approach in evaluating whether exigent circumstances justify a warrantless blood draw of a suspected drunk driver, an approach based solely upon the length of time required to secure a search warrant.

¶ 3 We affirm the trial court's suppression order. We hold that the trial court properly adhered to *Missouri v. McNeely*, —— U.S. ——, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013), in suppressing evidence of Schaufele's blood draw. We reject the People's invitation to disregard the majority opinion in *McNeely*, which instructs a trial court to consider the totality of the circumstances, and to adopt instead Chief Justice Roberts's concurring and dissenting opinion that "a warrantless blood draw may ensue" if "an officer could reasonably conclude that there is not sufficient time to seek and receive a warrant." *Id.* at 1573 (Roberts, C.J., concurring in part and dissenting in part).

¶ 4 Although only four justices expressly rejected Chief Justice Roberts's proposed modified per se rule, the Chief Justice's proposed approach garnered only three votes, and we do not feel at liberty to adopt it here.

## I. Facts and Procedural History

¶ 5 The trial court conducted an evidentiary hearing and made pertinent factual findings in its order granting Schaufele's motion to suppress. The People do not contest these findings, which are summarized below.

¶ 6 Schaufele was involved in a motor vehicle accident at about 7:10 a.m. The first police officer to arrive at the scene, Alden Langert,[1] observed that, although Schaufele was conscious, he was sluggish, his speech was mumbled and unintelligible, and he was largely nonresponsive to the officer's questions. The second officer to arrive, Patrick Andrews, described Schaufele as speaking with a "thick tongue"; he also noted that Schaufele had bloodshot, watery eyes and described his responses as "sluggish," "delayed," and "hesitant."

¶ 7 Officers Langert and Andrews did not smell alcohol on Schaufele's person or in the immediate vicinity, but they nevertheless concluded that Schaufele's behavior was consistent with either intoxication or a head injury. Likewise, a paramedic at the scene smelled Schaufele's breath at close range to assess whether alcohol was involved and did not smell anything indicative of alcohol consumption. Officer Andrews did not believe that probable cause then existed to arrest Schaufele for driving while intoxicated or impaired. Thus, he did not attempt to get a warrant for a nonconsensual blood test, nor did he instruct any other officers to seek Schaufele's consent for a blood draw or to obtain a warrantless blood draw without his consent.

¶ 8 Meanwhile, another officer, Suzanne Beckstrom, arrived at the scene. Officer Andrews briefed her about Schaufele's lethargic manner and slurred speech and told her to follow the ambulance to the hospital to continue investigating.

¶ 9 Paramedics transported Schaufele to the hospital at 7:36 a.m. Officer Beckstrom followed. When she attempted to speak with Schaufele at the hospital, Officer Beckstrom detected the "stale odor of alcohol" on his breath and body. She also noticed that his

---

1. In its suppression order, the trial court referred to Officer "Lankert"; however, the transcript of the evidentiary hearing makes clear that the officer's correct surname is Langert.

responses to her questions were unintelligible, his eyes were red and watery, and his speech was slurred.

¶ 10 Based on these observations, Officer Beckstrom decided that she had probable cause to conduct a blood draw. She attempted to speak with Schaufele to provide an advisement under Colorado's express consent law, but was unable to do so because he was either unconscious or sleeping. Officer Beckstrom then told a nurse to draw Schaufele's blood for alcohol analysis. The blood draw took place at 8:14 a.m.—one hour and four minutes after the reported time of the accident. A forensic analysis of the blood sample established that Schaufele's blood alcohol level was .205 grams of alcohol per one hundred milliliters of blood—well over the statutory threshold.

¶ 11 The police officers did not obtain, or seek to obtain, a warrant. At the suppression hearing, Officers Langert, Andrews, and Beckstrom testified that they were aware that the Greenwood Village Police Department, the Office of the District Attorney, the county attorneys in Arapahoe County, and the Colorado judicial branch all have established procedures in place (which may be initiated by computers in police cars) that would have enabled them to apply for and obtain a search warrant for a blood test on an exigent basis. But none of them had ever applied for an expedited warrant, and none of them did so here.[2]

¶ 12 The police ultimately determined that Schaufele caused the accident. He was charged with vehicular assault, driving under the influence, driving under the influence per se, and careless driving resulting in death or injury.

¶ 13 Before trial, Schaufele successfully moved to suppress evidence from the warrantless blood draw. In response, the People filed a motion for reconsideration, which—for the first time—suggested that the trial court should invoke the modified per se rule proposed by Chief Justice Roberts and endorsed by only two other members of the Supreme Court.[3] The trial court denied the motion.

¶ 14 The People then filed an interlocutory appeal under section 16–12–102(2), C.R.S. (2013), and C.A.R. 4.1, conceding that the trial court reached the right conclusion under existing law, but nonetheless urging with singular focus that we should reverse the trial court under the modified per se rule proposed by Chief Justice Roberts.

## II. Standard of Review

¶ 15 Suppression cases typically involve a mixed question of fact and law. *People v. Bonilla–Barraza*, 209 P.3d 1090, 1094 (Colo.2009). In reviewing a suppression order, we defer to the trial court's findings of fact. We will not overturn those factual findings if competent evidence in the record supports them. *People v. Castaneda*, 249 P.3d 1119, 1122 (Colo.2011). We review the trial court's application of the law de novo. *Id.; accord People v. Brunsting*, 2013 CO 55, ¶ 15, 307 P.3d 1073, 1078, *cert. denied*, —— U.S. ——, 134 S.Ct. 789, 187 L.Ed.2d 601 (2013).[4]

---

**2.** After admitting to their lack of experience with expedited warrants, the officers speculated that obtaining an expedited search warrant would have taken anywhere from one to four hours.

**3.** Justice Thomas did not join, endorse, or even address Chief Justice Roberts's proposal in his dissenting opinion. Instead, he advanced the position that when there is probable cause to believe that a suspect has been driving under the influence of alcohol, a warrantless blood draw does not violate the Fourth Amendment because the body's natural metabolization of alcohol constitutes an exigent circumstance. 133 S.Ct. at 1574 (Thomas, J., dissenting).

**4.** Schaufele asserts as an alternative argument that the People appeal the trial court's denial of the motion to reconsider the suppression order,

not the suppression order itself; accordingly, he urges this court to apply an abuse of discretion standard of review. Our cases with a similar procedural history show, however, that this court still reviews the underlying suppression order as a mixed question of law and fact, even when the order was challenged by way of a motion to reconsider. *See, e.g., People v. Cunningham*, 2013 CO 71, ¶¶ 7 n. 3, 9, 314 P.3d 1289, 1291 & n. 3; *Bonilla–Barraza*, 209 P.3d at 1093–94; *People v. Jiminez*, 863 P.2d 981, 983 (Colo.1993). The text of these opinions does not allow us to discern whether the prosecution restricted its appeals to the arguments raised in opposition to the motions to suppress. Nevertheless, *Jiminez* shows that this court will review the underlying suppression order even when the prosecution's arguments on a motion for reconsideration reveal a shift in focus. *See* 863 P.2d at 983 (dis-

¶ 16 Where, as here, a constitutional right is implicated, we assess whether the trial court "applied an erroneous legal standard or came to a conclusion of constitutional law that is inconsistent with or unsupported by the factual findings," considering the court's legal conclusion "under the totality of the circumstances." *People v. Syrie*, 101 P.3d 219, 222 (Colo.2004).

### III. Analysis

¶ 17 In seeking to reverse the trial court's suppression order, the People pose the following question: "Under the Fourth Amendment, do exigent circumstances justify a warrantless blood draw of a drunk driver if the police reasonably believe the blood can be drawn before a warrant can be secured?" In positing this question, they invite us to adopt the modified per se rule proposed by Chief Justice Roberts. Because we feel constrained by binding precedent of the Supreme Court, we decline to do so.

¶ 18 We begin with a brief discussion of the Fourth Amendment's applicability to blood draws. We next discuss the totality of the circumstances test for exigency that the Supreme Court articulated in *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and reiterated in the majority opinion in *McNeely*. We then examine whether the trial court correctly applied this test in evaluating the constitutionality of Schaufele's blood draw and determine that it did. We conclude by considering the People's invitation to shun the majority opinion in *McNeely* and to embrace instead the rule that Chief Justice Roberts proposed in his concurring and dissenting opinion. We reject that invitation.

### A. The Fourth Amendment

¶ 19 The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "[A] warrantless search of the person is reasonable only if it falls within a recognized exception." *McNeely*, 133 S.Ct. at 1558.

¶ 20 A blood draw is a search because it is "a compelled physical intrusion beneath [a defendant's] skin and into his veins to obtain a sample of his blood for use as evidence in a criminal investigation." *Id.* This constitutes "an invasion of bodily integrity [that] implicates an individual's 'most personal and deep-rooted expectations of privacy.'" *Id.* (quoting *Winston v. Lee*, 470 U.S. 753, 760, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985)); *see also Schmerber*, 384 U.S. at 770, 86 S.Ct. 1826 (emphasizing the "indisputable and great" importance of a warrant before a law enforcement officer "invade[s] another's body in search of evidence of guilt"); *Grassi v. People*, 2014 CO 12, ¶ 23, 320 P.3d 332, 338 ("Drawing blood from an unconscious party is a search that is 'subject to the protections of the Fourth Amendment to the United States Constitution.' In the motor vehicle context, the police infringe upon these protections if they draw blood from a non-consenting driver absent probable cause that he committed an alcohol-related driving offense." (quoting *People v. Schall*, 59 P.3d 848, 851 (Colo.2002))).

### B. *McNeely*

¶ 21 In *McNeely*, the Supreme Court expanded upon the decision it issued forty-seven years earlier in *Schmerber*, when the Court first enumerated the criteria to analyze the constitutional propriety of involuntary blood draws. *See* 384 U.S. at 768–71, 86 S.Ct. 1826. We summarized those criteria in *People v. Sutherland*, 683 P.2d 1192 (Colo. 1984):

First, there must be probable cause for the arrest of the defendant on an alcohol-related driving offense. Second, there must be a clear indication that the blood sample will provide evidence of the defendant's level of intoxication. Third, exigent circumstances must exist which make it impractical to obtain a search warrant. Fourth, the test must be a reasonable one and must be conducted in a reasonable manner.

---

trict court's suppression order was based entirely on determination that defendant did not knowingly and intelligently waive his rights before

interrogation, but the prosecution argued in its motion for reconsideration that suppression is improper in the absence of police coercion).

*Id.* at 1194 (citing *Schmerber*, 384 U.S. at 757, 86 S.Ct. 1826).

¶ 22 *McNeely* provided further guidance about the third criterion—the existence of exigent circumstances—again in the blood draw context. Like Schaufele, the defendant there was subject to a statutory implied consent law due to his operation of a motor vehicle.[5] Yet he successfully moved to suppress his blood draw results, arguing that the blood draw violated the Fourth Amendment because the police officer who ordered it did not attempt to secure a warrant. 133 S.Ct. at 1557.

■ ¶ 23 The Supreme Court considered "whether the natural metabolization of alcohol in the bloodstream presents a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." *Id.* at 1556. A majority of the Court expressly rejected a categorical rule and held, "consistent with general Fourth Amendment principles, that exigency in this context must be determined case by case based on the totality of the circumstances." *Id.*; *see also id.* at 1558, 1561 (referencing the need to assess the totality of the circumstances and conduct a "careful case-by-case assessment of exigency" and explicitly rejecting the " 'considerable overgeneralization' that a *per se* rule would reflect" (quoting *Richards v. Wisconsin*, 520 U.S. 385, 393, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997))).[6]

¶ 24 We have since characterized the Supreme Court's approach to exigency in *McNeely* as "a 'finely tuned' fact-based approach." *See Brunsting*, ¶ 28, 307 P.3d at

1080. We have also emphasized that the Court's totality of the circumstances approach "is intended to be malleable enough to address the 'variety of circumstances [that] may give rise to an exigency sufficient to justify a warrantless search.'" *Id.* (quoting *McNeely*, 133 S.Ct. at 1559). And we have characterized the approach as "a flexible exception that is measured by a fact-specific reasonableness inquiry." *Id.*

## C. The Trial Court's Totality of the Circumstances Analysis

¶ 25 Consistent with *Schmerber, McNeely*, and our case law interpreting and applying those decisions, the trial court considered the totality of the circumstances surrounding the nonconsensual and warrantless draw of Schaufele's blood.

¶ 26 First, the trial court conducted a probable cause analysis. It concluded that the police officers did not have probable cause to believe that Schaufele was operating his vehicle while intoxicated during the initial investigation at the accident scene. But, applying the fellow officer rule,[7] it determined that, as of 8:14 a.m. (when the blood draw took place), Officer Beckstrom did have probable cause to believe that Schaufele had driven while intoxicated.

¶ 27 Next, the trial court examined the interrelationship between federal constitutional law and Colorado's statutory framework for alcohol-related driving offenses. The trial court noted that the Fourth Amendment prohibits blood draws unless justified either by a warrant or by exigent circumstances that make obtaining a warrant

---

**5.** The events underlying *McNeely* took place in Missouri. Although Colorado's provision is phrased in terms of "expressed consent," its language and effect are similar to Missouri's "implied consent" law. *Compare* § 42–4–1301.1, C.R.S. (2013), *with* Mo. Ann. Stat. § 577.020(1) (West 2013).

**6.** Five justices—Justices Sotomayor, Scalia, Kennedy, Ginsburg, and Kagan—joined the majority opinion. In addition, four of those justices—Justices Sotomayor, Scalia, Ginsburg, and Kagan—issued a plurality opinion, and Justice Kennedy issued a concurring opinion. Chief Justice Roberts—joined by Justices Breyer and Alito—issued an opinion concurring in part and dissent-

ing in part. And Justice Thomas issued a dissenting opinion.

**7.** The fellow officer rule "operates to impute information that the police possess as a whole to an individual officer." *Grassi*, ¶ 13, 320 P.3d at 336. Recognizing that law enforcement officers routinely engage in coordinated investigations, we recently held that "the fellow officer rule imputes information that the police possess as a whole to an individual officer who effects a search or arrest if (1) that officer acts pursuant to a coordinated investigation and (2) the police possess the information at the time of the search or arrest." *Id.* at ¶ 21, 320 P.3d at 338.

impractical. The trial court also recognized that the warrant requirement is waived when the subject of a search provides express consent, and that Colorado statutory law establishes express consent for all drivers when a police officer has probable cause to believe that a driver has committed the offense of driving while under the influence.[8]

¶ 28 Further, the trial court correctly noted that, notwithstanding Missouri's implied consent statute, the Supreme Court presumed in *McNeely* that the Fourth Amendment requires a search warrant before a blood draw, absent exigent circumstances. *See McNeely*, 133 S.Ct. at 1561. And it correctly noted that our own case law makes clear that Colorado's express consent statute does not abrogate constitutional requirements. *See People v. Smith*, 254 P.3d 1158, 1162 (Colo.2011) ("The combined result of sections 42–4–1301.1(3) and 18–3–205 is that a police officer may perform blood tests on a driver without his or her consent if the officer has probable cause to believe the driver has committed vehicular assault under the influence of alcohol or drugs, *subject to the constitutional limitations of Schmerber*.") (emphasis added); *Sutherland*, 683 P.2d at 1194 (noting that under *Schmerber* "exigent circumstances must exist which make it impractical to obtain a search warrant" before a blood draw).

¶ 29 After considering these principles, the trial court suppressed the results of the blood draw, reasoning that the officers had failed to procure a search warrant and the People had not established exigent circumstances sufficient to justify the lack of a warrant. It did so after analyzing: (1) the chronology of events; (2) whether the investigation delayed the officers' ability to obtain a search warrant; (3) whether transporting Schaufele to the hospital delayed the officers' ability to obtain a search warrant; and (4) the availability of an expedited warrant pro-

cess and whether Officer Beckstrom could have used it before the alcohol in Schaufele's blood dissipated to such a degree that it would have lost its inculpatory value.

### D. Applying *McNeely*

¶ 30 Although the People structured their initial arguments to the trial court based on the totality of the circumstances standard, they do not challenge the court's application of that standard on appeal.

¶ 31 Instead, the People tailor their arguments to the separate standard that Chief Justice Roberts proposed in his concurring and dissenting opinion in *McNeely*:

> In my view, the proper rule is straightforward. Our cases establish that there is an exigent circumstances exception to the warrant requirement. That exception applies when there is a compelling need to prevent the imminent destruction of important evidence, and there is no time to obtain a warrant. The natural dissipation of alcohol in the bloodstream constitutes not only the imminent but ongoing destruction of critical evidence. That would qualify as an exigent circumstance, except that there may be time to secure a warrant before blood can be drawn. If there is, an officer must seek a warrant. If an officer could reasonably conclude that there is not, the exigent circumstances exception applies by its terms, and the blood may be drawn without a warrant.

133 S.Ct. at 1569 (Roberts, C.J., concurring in part and dissenting in part).

¶ 32 Although the People extol the virtues of this proposal at great length, the Chief Justice's proposed modified per se rule garnered the support of only two of his colleagues. We decline to adopt a proposed rule that circumvents the holding in *McNeely*, a proposed rule that even Chief Justice Roberts admitted the majority "resists." *See id.* at 1574.

---

8. Section 42–4–1301.1(1) provides that "[a]ny person who drives any motor vehicle upon the streets and highways and elsewhere throughout this state shall be deemed to have expressed such person's consent to the provisions of this section." Of relevance here, section 42–4–1301.1(2)(a)(I) provides that a driver shall be required to cooperate in a blood test for alcohol analysis when requested and directed by a law enforcement officer having probable cause to believe that the person was driving under the influence of alcohol. And section 42–4–1301.1(8) provides that a driver who is unconscious shall be tested to determine his blood alcohol content as provided in this section.

¶ 33 We have a duty to follow the Court's existing instructions concerning federal constitutional law. *See United States v. Howard,* 742 F.3d 1334, 1343 n. 3 (11th Cir. 2014) ("As we hope our decision in this case shows, we scrupulously follow Supreme Court decisions. It is not our role to critique their reasoning or to criticize their holdings, and we do not intend to do so here. To borrow a metaphor in vogue, we don't grade the Justices' papers, they grade ours.... The [Supreme Court's decision] is the law of the land, which must be and will be followed unless and until the Supreme Court decides it should not be.").[9]

¶ 34 We recognize that Justice Kennedy hinted that the Supreme Court may want to provide additional guidance on how to effectively implement its totality of the circumstances approach in a future case so as to "give important, practical instruction to arresting officers"—"instruction that in any number of instances would allow a warrantless blood test in order to preserve the critical evidence." 133 S.Ct. at 1569 (Kennedy, J., concurring in part); *see also id.* ("And this Court, in due course, may find it appropriate and necessary to consider a case permitting it to provide more guidance than it undertakes to give today.").

¶ 35 But we do not have the power to ignore Supreme Court precedent concerning the federal constitution based on speculation about how the Court might rule in the future. *See, e.g., People v. Hopkins,* 2013 COA 74, ¶¶ 24, 25, 328 P.3d 253 (rejecting the defendant's contention that the court should ignore the holding in *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), because Justice Thomas stated in a concurrence in a later case that "a majority of the Court now recognizes that *Almendarez–Torres* was wrongly decided"); *see also People v. Nunn,* 148 P.3d 222, 225 (Colo.App.2006) (same). So, until a majority of the Supreme Court tells us otherwise, we must apply the totality of the circumstances approach (that Justice Kennedy clearly joined).

¶ 36 Indeed, the Supreme Court has cautioned against permutations by each state supreme court that would apply federal constitutional law in a way that "would change the uniform 'law of the land' into a crazy quilt." *Kansas v. Marsh,* 548 U.S. 163, 185, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006) (Scalia, J., concurring).

### E. Justice Kennedy's Concurrence

¶ 37 The People assert that the majority opinion in *McNeely* does not preclude adoption of Chief Justice Roberts's proposal because only four justices expressly rejected his proposal. *See* 133 S.Ct. at 1563–67 (parts II.C, III). But Justice Kennedy's refusal to join the plurality opinion critiquing Chief Justice Roberts's proposal cannot be interpreted to constitute affirmative support for that proposal. Justice Kennedy's position is more appropriately measured by the legal principles he embraced. In the end, he joined a majority opinion that does far more than simply reject Missouri's argument that warrantless blood draws should be permitted in every case. Justice Kennedy united with the rest of the majority on critical concepts that are inherently inconsistent with Chief Justice Roberts's proposal.

¶ 38 For instance, one part of the majority opinion reiterates the importance of securing a warrant before drawing a blood sample. *See id.* at 1558 ("[T]he importance of requiring authorization by a 'neutral and detached magistrate' before allowing a law enforcement officer to 'invade another's body in search of evidence of guilt is indisputable and great.' " (quoting *Schmerber,* 384 U.S. at 770, 86 S.Ct. 1826)) (part II.A).

¶ 39 Other parts of the majority opinion articulate a totality of the circumstances standard and explicitly reject a per se rule

---

9. Our Oklahoma counterpart has aptly explained:

> Because the United States Supreme Court has spoken, this Court is not free to impose its own view of the law as it pertains to the competing interests involved.... We are doubly bound to uphold the law of the land. Our limited role, like the role of all state courts in such cases, is to apply federal constitutional law, not to make it nor to guess what it may become.

*In re: Initiative Petition No. 349, State Question No. 642,* 838 P.2d 1, 7 (Okla.1992).

focusing on only one consideration. *See, e.g., id.* at 1556 (emphasizing that "exigency in this context must be determined case by case based on the totality of the circumstances") (introduction to majority opinion); *id.* at 1559 (characterizing totality of the circumstances test as a "finely tuned approach to Fourth Amendment reasonableness" and noting "the fact-specific nature of the reasonableness inquiry" (citations and internal quotation marks omitted)) (part II.A); *id.* at 1561 (explaining the importance of deciding each case on its facts and not accepting "the considerable overgeneralization that a *per se* rule would reflect" (citation and internal quotation marks omitted)) (part II.B); *id.* at 1568 (acknowledging that the relevant factors in determining whether a warrantless search is reasonable "will no doubt vary depending upon the circumstances in the case") (part IV).

¶ 40 The holding in the majority opinion that Justice Kennedy joined thus directly conflicts with the approach advocated by Chief Justice Roberts, which singles out only one circumstance—the amount of time it takes to seek and receive a warrant—to the exclusion of all others.

## IV. Conclusion

¶ 41 The People seek to exploit some discord among the justices in *McNeely* to implement a fundamental change in Fourth Amendment jurisprudence in Colorado. But a majority of the Supreme Court has spoken, and has spoken clearly. We are duty-bound to follow that precedent.

¶ 42 We hold that the trial court properly adhered to *McNeely* in suppressing evidence of Schaufele's blood draw. In so holding, we do not mean to imply that a warrant is always necessary in involuntary blood draw cases. But here, the trial court's analysis is consistent with *McNeely*'s holding that the Fourth Amendment requires officers in drunk-driving investigations to obtain a warrant before drawing a blood sample when they can do so without significantly undermining the efficacy of the search, and the People do not challenge how the trial court applied the totality of the circumstances standard set forth in the majority opinion in

*McNeely.* Consequently, we affirm the trial court's suppression order.

JUSTICE BOATRIGHT concurs in the judgment, and CHIEF JUSTICE RICE joins in the concurrence in the judgment.

JUSTICE EID dissents, and JUSTICE COATS joins in the dissent.

JUSTICE BOATRIGHT, concurring in the judgment.

¶ 43 Motions for reconsideration are designed to allow trial courts to correct erroneous rulings or respond to changes in the law. They are not designed to allow parties to litigate brand new arguments. Here, however, the entirety of the People's argument on appeal rests on a claim that they failed to raise until filing a motion for reconsideration. Because that claim does not dispute the legality of the underlying suppression order—indeed, because the People in fact *accept* the trial court's legal conclusions in that order—reviewing the merits of the suppression order on appeal creates inefficiencies and undermines the need for finality in the judicial process. Hence, I would hold that the trial court did not abuse its discretion in denying the People's motion for reconsideration. Because my approach would result in affirming the trial court's suppression order, I concur in the plurality's judgment only.

## I. Procedural History

¶ 44 While the plurality comprehensively details the facts of this case, a brief review of the procedural history is instructive. After his arrest for vehicular assault, Mr. Schaufele moved to suppress the evidence from the blood draw. In his motion, he asserted that the police drew his blood without a warrant and therefore violated the Fourth Amendment. The trial court conducted multiple hearings on the motion, during which the People argued that the police had probable cause to believe that Schaufele had committed an alcohol-related felony and that they did not need a warrant. Crucially, at no point during either of these hearings did the People urge the trial court to adopt Chief Justice Roberts's proposed rule in his minority opinion in *Missouri v. McNeely,* —— U.S.

——, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013). Ultimately, the trial court granted Schaufele's motion to suppress. The trial court found that the police possessed probable cause but concluded that a warrant was nevertheless required absent exigent circumstances. The trial court further found that the People had failed to demonstrate, under the totality of the circumstances, that an exigency authorized a warrantless blood draw, meaning the police violated Schaufele's Fourth Amendment rights.

¶ 45 The People then filed a motion for reconsideration. In that motion, the People did not object to the trial court's factual findings or suggest that it had misapplied existing law. Rather, the People raised a brand new argument: that the trial court should adopt the rule that Chief Justice Roberts proposed in *McNeely*. The trial court denied this motion, concluding that the People "offer[ed] no legal basis ... to ignore the fact that a majority of the United States Supreme Court did *not* adopt the Chief Justice's dissenting opinion in *McNeely*." In their appeal to this Court, the People once again accept the trial court's factual findings, and they do not contend that the trial court erroneously applied existing law. Instead, the entirety of the People's appeal hinges on the same argument that they raised in their motion for reconsideration. In accordance with precedent, this Court should not weigh the merits of such an argument but should merely determine whether the trial court abused its discretion in denying the motion for reconsideration.

## II. The Trial Court Did Not Abuse Its Discretion in Denying the Motion for Reconsideration

¶ 46 Typically, a trial court may—in its discretion—grant a motion for reconsideration and reverse a prior ruling in one of four circumstances: (1) "its former ruling is no longer sound because of changed conditions"; (2) "it needs to correct its previous ruling because of a legal or factual error"; (3) "an intervening change in the law has occurred"; or (4) "manifest injustice would result from its original ruling." *People v. Warren*, 55 P.3d 809, 813 (Colo.App.2002). Generally speaking, "[a] trial court's decision on a motion to reconsider may not be reversed on appeal absent an abuse of discretion." *Steele v. Law*, 78 P.3d 1124, 1128 (Colo.App.2003).

¶ 47 Again, the only argument that the People raise on appeal is that this Court should adopt Chief Justice Roberts's proposed rule and, in so doing, reverse the trial court's denial of their motion for reconsideration. Thus, the only issue before this Court is whether the trial court abused its discretion in denying the motion for reconsideration. In my view, no such abuse occurred, as the People's argument satisfies none of the four criteria for granting such a motion. Between the time of the trial court's initial ruling and the time of the filing of the motion for reconsideration, no conditions changed, and no intervening change in the law occurred. Furthermore, there is no suggestion that manifest injustice would result from suppressing the evidence. Finally, despite the People's assertion to the contrary, the trial court did not predicate its ruling on a legal or factual error.

¶ 48 The People dispute the last point, apparently contending that the trial court committed legal error when it declined to adopt the Chief Justice's proposed rule. In my view, this argument is wrong. The Chief Justice did not author the plurality opinion in *McNeely*; rather, he concurred in part and dissented in part. In so doing, he urged the Court to abandon the traditional totality-of-the-circumstances test and to instead adopt a new test in drunk driving cases that compares the time necessary to obtain a warrant against the time necessary to obtain a blood draw. 133 S.Ct. at 1569–73 (Roberts, C.J., concurring in part and dissenting in part). The plurality, however, expressly refused to embrace this test. *See id.* at 1563 (plurality opinion) ("[W]e decline to substitute THE CHIEF JUSTICE's modified *per se* rule for our traditional totality of the circumstances analysis."). Therefore, the trial court's similar refusal to adopt such a rule was not an abuse of discretion.

¶ 49 Moreover, the People's attempt to assert an entirely new theory in their motion for reconsideration abuses the purpose of such a motion. Motions for reconsideration

are designed to correct erroneous court rulings; they are not designed to allow parties to present new legal arguments for the first time and then appeal their denial to this Court. *See Brodeur v. Am. Home Assurance Co.*, 169 P.3d 139, 149 (Colo.2007) (noting that the law of the case doctrine "is based primarily on considerations of judicial economy and finality"). If the People wished for the trial court to adopt the Chief Justice's proposed rule in this case, they should have made that argument at the initial suppression hearings.[1] But they apparently made a strategic decision *not* to do so, waiting instead to raise the argument in their motion for reconsideration. We have previously forbidden such strategic maneuvering. *See People v. Roybal*, 672 P.2d 1003, 1006 n. 7 (Colo.1983) ("A trial court may reconsider its own suppression order when there is new, probative evidence available and the prosecution shows good cause why that evidence was not introduced previously.... Here, however, the evidence that the prosecution now wishes to adduce was available at the first hearing, but the district attorney made a tactical decision not to present it."). Not only are such tactics inefficient as to undermine finality, but to countenance such behavior would encourage parties to raise new claims via motions for reconsideration whenever they receive an adverse ruling.

### III. This Court Should Only Review the Motion for Reconsideration, Not the Underlying Suppression Order

¶ 50 As the plurality acknowledges, the People do not dispute the analysis that the trial court applied in its original suppression order. Pl. op. ¶ 14 (noting that the People "conced[e] that the trial court reached the right conclusion under existing law"). Thus, the People do not object to the legal conclusions in that suppression order but instead

restrict their appeal to the trial court's denial of their motion for reconsideration. Nevertheless, the plurality chooses to review the suppression order de novo, suggesting that "cases with a similar procedural history" justify this approach. *Id.* at ¶ 15 n. 4. The plurality then cites several cases in support of this proposition. *Id.* (citing *People v. Cunningham*, 2013 CO 71, 314 P.3d 1289; *People v. Bonilla–Barraza*, 209 P.3d 1090 (Colo. 2009); *People v. Jiminez*, 863 P.2d 981 (Colo. 1993)). Respectfully, those cases are distinct from the instant case, and I thus would not reach the merits of the suppression order.

¶ 51 In both *Cunningham* and *Jiminez*, the trial court granted a motion to suppress and then denied the prosecution's motion for reconsideration. *Cunningham*, ¶ 2; *Jiminez*, 863 P.2d at 983. Because the motions for reconsideration disputed the legal conclusions that the trial court made in its initial suppression orders, this Court ignored those motions and reviewed the original orders on appeal. *See Cunningham*, ¶¶ 2, 9; *Jiminez*, 863 P.2d at 983.[2] Here, in contrast, the People did not contest the legality of the trial court's initial suppression order but instead raised a wholly new argument in their motion for reconsideration, and the entirety of their appeal hinges on the validity of that argument. Therefore, because the People did not make this argument when opposing the motion to suppress, review of the underlying suppression order is, in my view, unwarranted. Accordingly, this Court should review the trial court's denial of the motion for reconsideration under an abuse of discretion standard and should not address the merits of the initial suppression order.

### IV. Conclusion

¶ 52 The procedural posture of this case is clear: The trial court found that no exigency prevented the police from attempting to ob-

---

1. Indeed, although the parties discussed *McNeely* at length during the hearings, counsel for the People alluded to the Chief Justice's partial dissent only once, and only in a descriptive fashion. At no point prior to filing their motion for reconsideration did the People urge the trial court to adopt the Chief Justice's proposed rule.

2. Similarly, in *Bonilla–Barraza*, after the trial court granted the defendant's motion to sup-

press, the People appealed "[u]pon the trial court's denial of [their] motion for reconsideration." 209 P.3d at 1093–94. Although the opinion does not illuminate the details of the motion for reconsideration, there is no suggestion that the People restricted their appeal to the arguments raised in that motion, which is why this Court reviewed the initial suppression order. *See id.* at 1094.

tain a search warrant before performing a blood draw, and the People could have contested that ruling in their appeal. Yet that is not what the People chose to do. Rather, the People, in a motion for reconsideration, asserted an entirely new argument that they failed to present at the underlying motion's hearing. Because this new argument did not satisfy any of the criteria for filing a motion for reconsideration, I would not consider the merits of the initial suppression order. Rather, I would hold that under these circumstances the trial court did not abuse its discretion in denying the motion for reconsideration. Because my approach would result in affirming the trial court's suppression order, I concur in the plurality's judgment only.

I am authorized to state that CHIEF JUSTICE RICE joins in the concurrence in the judgment.

JUSTICE EID, dissenting.

¶ 53 The plurality opines that this court must follow rulings of the U.S. Supreme Court on matters of federal constitutional law, including *Missouri v. McNeely*, —— U.S. ——, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013). Pl. op. ¶¶ 35–36. I wholeheartedly agree with this irrefutable proposition. *See* U.S. Const. art. VI, § 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Law; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding").

¶ 54 The problem in this case is that the plurality's opinion rests on the fundamental misapprehension that the "majority opinion" in *McNeely* rejected Chief Justice Roberts' approach regarding the circumstances under which a warrantless blood draw should be permitted, leading it to mistakenly conclude that we must reject that approach as well. Pl. op. ¶¶ 3–4, 17, 32.[1] But there was no

such "majority opinion" rejecting the Chief Justice's reasoning in *McNeely*. Indeed, as the opinion itself clearly states, Justice Sotomayor only delivered "an opinion" (that is, a plurality) with respect to the parts of her opinion that rejected the Chief Justice's proposal. —— U.S. ——, 133 S.Ct. at 1556. A four-person plurality is a "point of reference for further discussion of the issue" but is "not binding precedent." *Texas v. Brown*, 460 U.S. 730, 737, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). We are thus free to consider— and adopt—the Chief Justice's proposal. Because the plurality fundamentally misinterprets the *McNeely* majority as rejecting the Chief Justice's approach, I respectfully dissent.

¶ 55 The plurality bases its misreading of *McNeely* on the fact that the majority opinion in that case—written by Justice Sotomayor, and joined by Justices Scalia, Kennedy, Ginsburg, and Kagan—relied upon the totality of the circumstances test in rejecting Missouri's position that a warrantless blood draw was permissible in all circumstances due to the exigency of dissipation of alcohol in the blood. —— U.S. ——, 133 S.Ct. at 1563; pl. op. ¶¶ 3, 23. Importantly, however, the majority used the totality of the circumstances test to refute Missouri's position that would dispense with a warrant in *all circumstances*. —— U.S. ——, 133 S.Ct. at 1563. It did not suggest—as the plurality here holds—that the totality of the circumstances test is inconsistent with any sort of guidance as to the application of the totality test in a particular set of circumstances. Pl. op. ¶ 40.

¶ 56 That this is the case is demonstrated by the interplay between Justice Sotomayor's majority opinion, her plurality opinion, Justice Kennedy's partial concurrence, and the Chief Justice's concurring and dissenting opinion. Indeed, like the majority, the Chief Justice—joined by Justices Breyer and Alito[2]—expressly endorsed the totality of the

---

1. I do, however, agree with the plurality that we should address the application of *McNeely* to this case. The prosecution's citation to *McNeely* before the trial court on rehearing was not an attempt to bring a new claim, but rather the citation of new authority to support an existing claim—namely, that the warrantless blood draw in this case was consistent with the Fourth

Amendment. Thus, as the plurality observes, we review the merits of the suppression order *de novo*. Pl. op. ¶ 15.

2. The plurality makes much of the fact that the Chief Justice's approach "garnered the support of only two of his colleagues." Pl. op. 32; *see also id.* at ¶ 4 (same). However, Justice Thomas

circumstances test. —— U.S. ——, 133 S.Ct. at 1569 (Roberts, C.J., concurring in part and dissenting in part) (stating "I have no quarrel with the Court's 'totality of the circumstances' approach as a general matter; that is what our cases require"). The Chief Justice went on, however, to observe that because "the circumstances in drunk driving cases are often typical," the Court "should be able to offer guidance on how police should handle cases like the one before us." *Id.* The Chief Justice then proposed such guidance: a warrantless blood draw should be permitted when "an officer ... reasonably conclude[s] that there is not sufficient time to seek and receive a warrant, or he applies for one but does not receive a response before blood can be drawn." —— U.S. ——, 133 S.Ct. at 1573 (Roberts, C.J., concurring in part and dissenting in part).

¶ 57 Justice Sotomayor "delivered the opinion of the Court"—that is, the majority opinion—only "with respect to Parts I, II–A II–B, and IV." —— U.S. ——, 133 S.Ct. at 1556. These sections of the opinion reject the State of Missouri's argument that a warrant is never required. However, she only delivered "an opinion"—that is, a plurality opinion—"with respect to Parts II–C and III, in which SCALIA, GINSBURG, and KAGAN, JJ., joined." —— U.S. ——, 133 S.Ct. at 1556. These sections criticize the Chief Justice's approach. Justice Kennedy plainly declined to join the sections of Justice Sotomayor's opinion critical of the Chief Justice's approach, and instead joined only those portions of the opinion rejecting Missouri's argument that warrantless blood draws should be permitted in every case. —— U.S. ——, 133 S.Ct. at 1568 (Kennedy, J., concurring in part) (stating "I join Parts I, II–A, II–B, and IV of the opinion of the Court," omitting sections II–C and III).

¶ 58 In elaborating upon his position, Justice Kennedy wrote that "the instant case, by reason of the way in which it was presented and decided in the state courts, does not provide a framework where it is prudent to

hold any more than that always dispensing with a warrant for a blood test when a driver is arrested for being under the influence of alcohol is inconsistent with the Fourth Amendment," *id.*—in other words, it was enough to dispense with the case to hold that Missouri's argument was wrong. It was therefore unnecessary, in his view, "to consider in detail" the approach espoused by the Chief Justice. *Id.* He noted, however, that "this Court, in due course, may find it appropriate and necessary to consider a case permitting it to provide more guidance than it undertakes to give today." *Id.; see also* —— U.S. ——, 133 S.Ct. at 1574 (Roberts, C.J., concurring in part and dissenting in part) (acknowledging that the Missouri courts did not apply the rule he proposed, and stating that "this Court should not do so in the first instance").

¶ 59 In sum, Justice Kennedy did not reject the Chief Justice's position; in fact, he expressly acknowledged that "guidance" within the totality test might be "appropriate and necessary" in the future. He simply concluded that such guidance was not necessary to resolve the case before the Court. The fact that the *McNeely* majority opinion embraces the totality of the circumstance test thus cannot be read—as the plurality in this case does—as a rejection of the Chief Justice's approach. *See, e.g.,* pl. op. ¶ 37 (suggesting that Justice Kennedy "united with the rest of the majority on critical concepts that are inherently inconsistent with Chief Justice Robert's proposal"); *id.* at ¶ 40 ("The holding in the majority opinion that Justice Kennedy joined thus directly conflicts with the approach advocated by Chief Justice Roberts"). If this were true, Justice Kennedy would have joined Justice Sotomayor's plurality, rather than expressly declining to join it and leaving consideration of the Chief Justice's approach to future case development.

¶ 60 At most, the majority in *McNeely* rejected Missouri's argument as inconsistent

---

would have gone further than the Chief Justice, writing in dissent that he would have upheld Missouri's no-warrant approach in all cases. —— U.S. ——, 133 S.Ct. at 1574 (Thomas, J., dissenting). His vote therefore implicitly includes (but

goes further than) the Chief Justice's approach. For purposes of the majority's vote-counting, then, the count stands at four Justices "for" the Chief Justice's approach (three expressly and one by implication), and four votes "against."

with the totality of the circumstances test. The People in this case are not asking us to adopt Missouri's argument. Thus, the plurality is simply wrong to suggest that the People "invit[e] [us] to disregard the majority opinion in *McNeely*," pl. op. 3, or ask us "to adopt a proposed rule that circumvents the holding in *McNeely*," *id.* at ¶ 32, or argue that we should "ignore Supreme Court precedent," *id.* at ¶ 35.

¶ 61 The plurality's misreading of *McNeely* leads it to do three problematic things. First, it leads it to chastise the People, implicitly at least, for raising an approach they have every right to raise. Pl. op. ¶ 3. Second, it leads it to reject the Chief Justice's approach on supremacy grounds without considering it on the merits, even though there is no binding U.S. Supreme Court opinion rejecting it. Pl. op. 4 ("we do not feel at liberty to adopt [the Chief Justice's proposal] here"); 17 ("we feel constrained by binding precedent of the Supreme Court"); 35 ("So, until a majority of the Supreme Court tells us otherwise, we must apply the totality of the circumstances approach."). Ultimately, by misinterpreting *McNeely* as binding precedent rejecting the Chief Justice's proposal, the plurality here frustrates the very purpose of Justice Kennedy's partial concurrence, which was to permit consideration of the approach in the appropriate future case. *See Texas v. Brown*, 460 U.S. at 737, 103 S.Ct. 1535 (noting that the "opinion of four Members of [the Supreme] Court" is a "point of reference for further discussion of the issue," but "not a binding precedent").

¶ 62 Finally, and not to be lost in the analysis, the plurality comes to the wrong result here. Officer Beckstrom did not have probable cause for a blood draw until she smelled alcohol on the defendant's breath after he had been transported to the hospital. Although she attempted to speak to the defendant in order to obtain consent to the blood draw, she was unable to do so because he was either unconscious or asleep. The blood draw occurred about an hour after the accident, and it would have taken at least one to four hours for the police to obtain a warrant at that point. Under the Chief Justice's approach, it would have taken far longer for the police to obtain a warrant than to achieve the blood draw, and therefore the warrantless blood draw was reasonable. But given the late-forming probable cause and the time that had passed since the accident, it is likely that there was already substantial dissipation of alcohol from the blood. Even under the guidance-free totality of the circumstances test endorsed by the plurality, then, the warrantless blood draw would have been reasonable.

¶ 63 Moreover, the trial court erred in concluding—in a finding unexamined by the plurality—that because a warrant could have been obtained before the alcohol entirely dissipated from the defendant's blood, a warrant was required. Pl. op. 29. There was no way for the police to know the defendant's blood alcohol level before the blood draw was performed, and thus no way for them to know whether the blood alcohol would be entirely dissipated by the time the warrant was obtained. *See McNeely*, 133 S.Ct. at 1571 (Roberts, C.J., concurring in part and dissenting in part) (noting that "[t]he officer is unlikely to know precisely when the suspect consumed alcohol or how much"). Under the plurality's opinion upholding the trial court's ruling, it appears that a warrant would always be required, because there is always a chance that it could be obtained before the alcohol entirely dissipates from the defendant's blood. Ironically, then, the plurality's opinion seeks to impose the same sort of categorical approach—this time, requiring a warrant—that it purports to disavow.

¶ 64 Fortunately, today's plurality will not constitute binding precedent for future decisions.[3] Instead, together with the concur-

---

3. Here, the plurality and the concurring opinion take mutually exclusive approaches: the plurality would dispose of the case on the merits based on its reading of *McNeely*, while the concurrence would not reach the merits. In such a situation, where there is no "narrowest opinion" representing the "common denominator of the court's reasoning" for a majority of the court, there is no determinate rationale or holding, but simply a result. *U.S. v. Carrizales–Toledo*, 454 F.3d 1142, 1151 (10th Cir.2006).

rence in the judgment, it will simply dispose of this case, and should be taken for nothing more.

¶ 65 Because I would reverse the trial court's order, I respectfully dissent.

I am authorized to state that JUSTICE COATS joins in the dissent.